**Angelo RODRIGUEZ, Plaintiff–Appellant,**

v.

**CITY OF CHICAGO, a municipal corporation, Defendant–Appellee.**

No. 97–3339.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1998.

Decided Sept. 21, 1998.

David A. Shaneyfelt, Hoogendoorn, Talbot, Davids & Godfrey, Chicago, IL, Scott C. Idleman (argued), Marquette University, School of Law, Milwaukee, WI, for Plaintiff–Appellant.

Susan S. Sher, Ruth F. Masters (argued), Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, CUMMINGS and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

On September 20, 1995, Angelo Rodriguez, a patrol officer in the Chicago Police Department ("CPD"), filed a four-count complaint against the City of Chicago. In that complaint, Officer Rodriguez alleged that the City discriminated against him on the basis of his religion by refusing to exempt him from an assignment to stand guard outside an abortion clinic on November 19, 1994. The only claim at issue in this appeal is Officer Rodriguez's contention that the City's refusal to exempt him from the clinic duty violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17.[1] On August 11, 1997, upon the parties' cross-motions for summary judgment, the district court granted the City's motion for summary judgment and denied Officer Rodriguez's motion. This appeal followed. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

---

1. In addition to his Title VII claim in Count I of his complaint, Officer Rodriguez also sought relief under the Municipal Code of the City of Chicago (Count II) and the Religious Freedom Restoration Act ("RFRA") (Count III) based on the same incident. In Count IV, Officer Rodriguez sought to enjoin the City from assigning him to clinic duty. On January 11, 1996, Officer Rodriguez's claim under the Municipal Code was dismissed by the district court pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action. During the pendency of the parties' cross-motions for summary judgment, Count III of Officer Rodriguez's complaint was dismissed after the Supreme Court ruled RFRA unconstitutional in *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Although it is less than clear from the record, it appears that Officer Rodriguez's claim for injunctive relief (Count IV) was dismissed after the district court granted summary judgment to the City on the Title VII claim.

# I

## BACKGROUND

### A. Facts [2]

Officer Rodriguez has served as a patrol officer in the CPD's 14th District since September 1980. Two abortion clinics are located in that district: (1) the Central Medico Pan American Clinic, located at 3412 West Fullerton Avenue ("the Fullerton Clinic") and (2) the American Women's Medical Center, located at 2744 North Western Avenue ("the Western Clinic"). Following a mass demonstration outside the Fullerton Clinic on October 23, 1993, the CPD began to assign one or more officers to stand guard outside the abortion clinics throughout the City. The CPD typically assigned officers to such "clinic duty" only on Saturday mornings. The officers assigned to clinic duty are instructed to establish a police presence outside the clinics by parking their squad cars in front of the clinics. The purpose of the clinic duty is to protect the clinics' property and employees and to keep the peace.

When the clinic duty first began, the CPD would assign officers on the "First Watch" [3] to arrive at each clinic at about 5:00 a.m., until the "Second Watch" officers arrived shortly after the 7:00 a.m. morning roll call. Those officers would then stay until about 9:00–9:30 a.m., and check for the appearance of demonstrators. If none came, the CPD would cancel the detail and instruct the beat officers to pass by the clinics frequently and note if any demonstrators appeared. If any arrived, supervisors would send a relief officer to the detail at approximately 9:30–10:00 a.m. and at two and one-half hour intervals thereafter, until the last demonstrators left, usually around noon.

The clinic duty was activated regularly on Saturdays following the October 1993 demonstration at the Fullerton Clinic, although it was curtailed somewhat during the winter months. In August 1994, clinic assignments were increased in response to violence outside an abortion clinic in Pensacola, Florida. However, since November 1994, clinic assignments have been less frequent because of a lack of demonstrators, and the CPD activates the Saturday morning clinic duty only on an "as needed" basis.

Officer Rodriguez was among the officers assigned to the October 23, 1993 mass demonstration at the Fullerton Clinic and assisted in making arrests outside the clinic. However, while making arrests that day, he became unsettled about his role outside the clinic. As a life-long Roman Catholic, Officer Rodriguez accepts the teachings of the Roman Catholic Church that an elective abortion is the wrongful taking of innocent human life and that individuals have a general moral obligation to avoid participating in, or facilitating, an elective abortion. Subsequently, he was assigned to clinic duty on three occasions in the months following the demonstration. During that time, he became more and more convinced that his presence at the clinic facilitated the ongoing activities of the abortion clinic and, consequently, conflicted with his religious beliefs.

On January 29, 1994, Officer Rodriguez informed his watch commander, Captain William Guswiler, of his religious opposition to serving on clinic duty. Officer Rodriguez told Captain Guswiler that he had no objection to going to the clinic in an emergency situation but that he did not want to be assigned to the regular clinic duty. Captain Guswiler told Officer Rodriguez that he would try not to assign him to such duty; however, he could not give Officer Rodriguez a formal exemption from such work. For four months thereafter, Officer Rodriguez was not assigned to clinic duty.

In April 1994, Officer Rodriguez went on medical leave due to an injury. When he returned in September 1994, he again sought to ensure that he would not be assigned to clinic duty. Rather than rely on his informal arrangement with Captain Guswiler, Officer Rodriguez sent a memorandum to 14th District Commander Jose Velez in which he requested to be exempted from future assignments at abortion clinics because of his

---

2. Unless otherwise noted, the facts in this case are undisputed.

3. The CPD divides its workday into three overlapping "watches": The First Watch works from approximately 11:00 p.m. to 8:00 a.m., the Second Watch from 7:00 a.m. to 4:00 p.m., and the Third Watch from 3:00 p.m. to midnight.

religious beliefs. After receiving Officer Rodriguez's missive, Commander Velez discussed Officer Rodriguez's request with Captain Guswiler and they agreed that Officer Rodriguez was not free to refuse an assignment, but that, when possible, Guswiler would continue to avoid assigning Officer Rodriguez to clinic duty. Commander Velez, however, never responded to Officer Rodriguez directly; nor did he inform anyone else of the request, because, in his view, CPD policy clearly prohibits an officer from refusing an assignment.

On November 19, 1994, Captain Guswiler decided to assign police personnel to one of the clinics because demonstrators were present. At approximately 11:35 a.m., the officer on duty at the clinic requested a replacement in order to take a "personal."[4] Sergeant Ronald Grimes assigned Rodriguez to replace the officer on clinic duty. After receiving the assignment, Officer Rodriguez promptly requested a "personal" and returned to the 14th District station. At the station, he told Sergeant Grimes that he objected to such work and informed him of his informal arrangement with Captain Guswiler. Sergeant Grimes responded, however, that Officer Rodriguez could not refuse the assignment. Officer Rodriguez then agreed to fulfill the assignment under protest. He was on clinic duty for approximately one-half hour before the watch was canceled for the remainder of the day. Since that incident, Officer Rodriguez has endeavored to avoid clinic duty by utilizing various options available to him, such as taking vacation time and obtaining out-of-district assignments on those days (Saturdays) on which the clinic duty is most likely to be activated. According to the record before us, he has not been assigned to any further clinic duty since this incident.

## B. Proceedings in the District Court

On September 20, 1995, Officer Rodriguez initiated the present action against the City asserting four claims: (1) Count I alleged that the City discriminated against him on the basis of his religion by refusing his request to be exempted from clinic duty in violation of Title VII of the 1964 Civil Rights Act; (2) Count II alleged religious discrimination under the Municipal Code of the City of Chicago based on the same incident; (3) Count III alleged a violation of religious liberty under the Religious Freedom Restoration Act ("RFRA") for the same incident; and (4) Count IV sought an injunction prohibiting the CPD from assigning Officer Rodriguez to clinic duty. At various stages in the proceedings, the district court dismissed Officer Rodriguez's claims under the Municipal Code and RFRA,[5] leaving only his Title VII claim and his request for injunctive relief. The parties then filed cross-motions for summary judgment on the Title VII claim.

The district court granted the City's motion for summary judgment and denied Officer Rodriguez's. The court began its analysis of Officer Rodriguez's Title VII claim by noting that the City had conceded that Officer Rodriguez had established a prima facie case of religious discrimination. At that point, the burden shifted to the City to show that it had made a reasonable accommodation of Rodriguez's religious beliefs or that any accommodation would result in undue hardship. The district court held that various options were available to Officer Rodriguez under the existing collective bargaining agreement[6] ("CBA") by which he could avoid the conflict between his job assignments and religious beliefs and that, accordingly, the City has satisfied its duty to accommodate him. In particular, the court found that, under the CBA, Officer Rodriguez could have requested transfer to six alternative districts on the north side comparable to the 14th District that did not have facilities where abortions were performed. Due to his seniority, Rodriguez would have been able to make the change with no reduction in his level of pay or benefits. In addition, there existed several other options available to Officer Rodriguez by which he could have

---

4. Officers can take a "personal" for various reasons, such as to use a lavatory.

5. *See supra* note 1.

6. At all relevant times, Officer Rodriguez was covered by a CBA between the City and the Fraternal Order of Police Local Lodge No. 7.

avoided clinic duty such as applying for "special function assignments," changing his shift, changing his start time, using time due and using unpaid leave. In this regard, the court noted that Officer Rodriguez had been able to avoid clinic duty since November 1994 by taking advantage of those options.

## II

## DISCUSSION

### A. Standard of Review

■■■ We review de novo the district court's grant of summary judgment. *See Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1095 (7th Cir.), *petition for cert. filed*, 67 U.S.L.W. 3093 (U.S. July 2, 1998) (No. 98–37). Like the district court, we review the record in the light most favorable to the nonmoving party, Officer Rodriguez, and draw all reasonable inferences in his favor. *See Vanasco v. National–Louis Univ.*, 137 F.3d 962, 965 (7th Cir.1998). "We shall uphold a grant of summary judgment only when 'the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.' " *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) (quoting Fed.R.Civ.P. 56(c)).

### B. Officer Rodriguez's Title VII Claim

■■■ Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1). Religion, in turn, includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Under Title VII, therefore, an employer must reasonably accommodate an employee's religious observance or practice

unless it can demonstrate that such accommodation would result in an undue hardship to the employer's business. Accordingly, we turn first to the issue of whether the City has satisfied its duty of reasonable accommodation; only if we answer that question in the negative need we proceed to the "undue hardship" prong of the Title VII analysis.

■■■ A reasonable accommodation of an employee's religion is one that "eliminates the conflict between employment requirements and religious practices." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). The district court concluded that the City had satisfied its duty to accommodate Officer Rodriguez by providing him the opportunity, through the CBA, to transfer to a district that did not have an abortion clinic with no reduction in his level of pay or benefits. We agree. It is undisputed that, under the terms of the CBA, Officer Rodriguez could transfer to a district comparable to the 14th District but without abortion clinics. Such a transfer would eliminate the conflict between Officer Rodriguez's religious beliefs and his job duties and he would suffer no reduction in pay or benefits as a result of such a transfer. Accordingly, a transfer under the terms of the CBA is "a paradigm of 'reasonable accommodation.' " *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir.1993), *cert. denied*, 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).

Indeed, in *Wright*, we encountered facts similar to those before us today. In that case, the plaintiff Wright, a Seventh Day Adventist, observed the Sabbath from sundown Friday until sundown Saturday and was required to refrain from any employment activities during that time. Wright was an employee of the United States Postal Service ("USPS"). *See id.* at 215. For several years, Wright held a box sorter position at the Milwaukee Post Office, which did not require him to work on his Sabbath. However, in April 1987, Wright received a letter from the post office notifying him that his position was being eliminated but that, because of this job elimination, he would have the opportunity to bid for a new position in a special bidding procedure. Although none of

the positions offered in the special bidding procedure accommodated Wright's religious practices, he had the opportunity through the regular bidding procedure to bid on four other positions that did not require him to work on his Sabbath. *See id.* at 216. Due to his seniority, Wright would have received at least two of those positions had he bid for them. As a consequence of his failure to bid on either position, Wright was placed in a job that required him to work on Friday night. After his supervisor rejected his request to take Friday nights off, Wright resigned.

■ We rejected Wright's contention that the USPS's actions violated its duty under Title VII to accommodate his religious practices. Instead, we held that the USPS satisfied its duty to accommodate Wright by allowing him to select, through the bidding system, a position the requirements of which did not interfere with his religious practices. *See id.* at 217. By refusing to exercise that option, it was Wright, not his employer, who was responsible for the conflict. *See id.* Moreover, in reaching that conclusion, we stressed that Wright was not entitled to the accommodation of his choosing—"Title VII ... requires only 'reasonable accommodation,' not satisfaction of an employee's every desire." *Id. Accordingly, the fact that Wright had to give up his option to bid on other jobs he found preferable did not make the bidding system any less of a reasonable accommodation.*

Similarly, in the case before us today, the fact that Officer Rodriguez may prefer an accommodation that allows him to remain in the 14th District does not render a transfer "unreasonable." Like the jobs available to Wright through the bidding process, a transfer to another district without an abortion clinic is eminently reasonable because it will allow Officer Rodriguez to eliminate the conflict between his job and religious beliefs without a reduction in pay or benefits. The fact that the City cannot force Officer Rodri-

guez to transfer to a district without abortion clinics, just as the USPS could not force Wright to bid on the position which did not require him to work on his Sabbath, does not mean that providing him the option to do so is an unreasonable accommodation.

■ Furthermore, the EEOC and several other circuit courts of appeal have concluded, as we did in *Wright*, that it is a reasonable accommodation to permit an employee to exercise the right to seek job transfers or shift changes, particularly when such changes do not reduce pay or cause loss of benefits. *See* 29 C.F.R. § 1605.2(d)(1)(iii); *see also Cook v. Lindsay Olive Growers*, 911 F.2d 233, 241–42 (9th Cir.1990) (holding that employer satisfied duty of reasonable accommodation by providing employee with the option of transfer to a different shift which would not conflict with employee's observation of Saturday Sabbath; new position had lower hourly wage but employee's gross wages were higher because position offered more hours); *Hudson v. Western Airlines, Inc.*, 851 F.2d 261, 265–67 (9th Cir.1988) (holding that various options available to employee under collective bargaining agreement, which allowed employees to adjust their schedules to accommodate personal desires and preferences including religious observances, satisfied employer's duty of reasonable accommodation); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145 (5th Cir.1982) (holding that employer satisfied duty of reasonable accommodation by means of flexible scheduling system and by providing employees with opportunity to trade days off); *United States v. City of Albuquerque*, 545 F.2d 110, 113–14 (10th Cir.1976) (holding that City's fire department satisfied duty of reasonable accommodation by providing employees with several options to avoid working a particular shift, including trading shifts with another fireman), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977).[7]

---

**7.** In reaching the conclusion we reach today, we emphasize that an employer will not always be able to provide an employee with reasonable accommodation through the provisions of a CBA. The determination of whether an accommodation is reasonable in a particular case must be made in the context of the unique facts and

circumstances of that case. *See Redmond v. GAF Corp.*, 574 F.2d 897, 902–03 (7th Cir.1978). If the transfer or job-swapping options available to all employees under a CBA would not eliminate the particular employee's religious conflict, "the burden remains on the employer to establish that it is unable to reasonably accommodate the em-

Despite the fact that he acknowledges that a transfer to a different district pursuant to the CBA would eliminate the conflict between his job responsibilities and his religious beliefs, Officer Rodriguez nonetheless asserts that the district court erred in holding that the CBA provided reasonable accommodation to him for three reasons: (1) He asserts that the City should have accommodated him by exempting him from clinic duty thereby allowing him to stay in the 14th District; (2) he asserts that an accommodation requiring him to transfer to another district is not reasonable because it would require him to forfeit his right under the CBA to remain in the district of his choice; (3) he maintains the City should not be allowed to fulfill its duty of reasonable accommodation by ignoring his request for accommodation and forcing him to invoke his transfer options if he wishes to avoid the duty.

Officer Rodriguez first contends that the City would not suffer undue hardship by accommodating him within the 14th District. "Title VII, however, requires only 'reasonable accommodation,' not satisfaction of an employee's every desire." *Wright*, 2 F.3d at 217. Indeed, in *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986), the Supreme Court held that "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Id.* at 68, 107 S.Ct. 367. In this case, we have concluded that a transfer under the terms of the CBA would eliminate Officer Rodriguez's religious conflict; accordingly, we need not consider whether the City would have suffered an undue hardship by accommodating Officer Rodriguez within the 14th District. By providing at least one reasonable accommodation, the City discharged its

obligation under Title VII. *See id.* at 69, 107 S.Ct. 367; *Wright*, 2 F.3d at 217.

Officer Rodriguez next asserts that an accommodation requiring him to transfer to another district is not reasonable because it would require him to forfeit his right under the CBA to remain in the district of his choice. In making this contention, Officer Rodriguez invites our attention to Section 10.2 of the CBA which provides as follows:

> The Employer shall not discriminate against officers, and employment-related decisions will be based on qualifications and predicted performance in a given position without regard to race, color, sex, religion, age (40–63), or national origin of the officers as a result of membership in the Lodge. Nothing contained in this Agreement shall be deemed to preclude the mandatory retirement of any officer upon or after the attainment of age 63. Officers shall not be transferred[,] assigned or reassigned for reasons prohibited by this Section 10.2.

Officer Rodriguez contends that this provision entitles him to stay in the shift and district of his choice and that the City's proposed accommodation would therefore violate this provision by requiring him to transfer to a different district because of his religion. We cannot accept Officer Rodriguez's interpretation of Section 10.2 of the CBA. Section 10.2 clearly delineates that the City may not *force* Officer Rodriguez to transfer to another district because of his religion; it does not foreclose the City from offering him a transfer as a reasonable accommodation of his religious beliefs.

■ Officer Rodriguez's final contention is that the City failed in its duty to open a dialogue with Officer Rodriguez on the question of reasonable accommodation. In particular, he points to Commander Velez's failure to make any response to his formal request

ployee's religious beliefs without incurring undue hardship." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). For example, in *Smith*, the Sixth Circuit held that a CBA's provision permitting employees to trade days off with other employees did not provide reasonable accommodation to an employee who

had a religious objection to seeking such a trade because, in his view, it was also morally wrong to induce another to work in his stead on the Sabbath. *See id.* at 1088. In this case, however, it is clear that a transfer to a different district under the terms of the CBA would resolve the conflict between Officer Rodriguez's job responsibilities and his religious beliefs.

for accommodation. *See, e.g., Philbrook*, 479 U.S. at 69, 107 S.Ct. 367 (noting that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business" (internal quotations omitted)); *Redmond v. GAF Corp.*, 574 F.2d 897, 902 (7th Cir.1978) (same). Although Commander Velez's failure to respond to Officer Rodriguez's formal request gives us some pause, we conclude that the City satisfied its duty in this regard by engaging in the collective bargaining process with Officer Rodriguez's union. As a result of that dialogue, the City and the union agreed to provide certain police officers the option to transfer districts for whatever reason without a diminution in their pay or benefits. This understanding was reflected in the CBA, and Officer Rodriguez was aware that the CBA provided him with this option. Under these circumstances, we cannot say that Officer Rodriguez was prejudiced by Commander Velez's failure to respond to his formal request for an exemption from clinic duty; nor can we say that Velez's failure to respond resulted in a substantive violation of Title VII.[8]

### Conclusion

Because the CBA provided Officer Rodriguez with the option of transferring to a district without an abortion clinic and such a transfer would have eliminated the conflict between his job responsibilities and his religious beliefs, we conclude that the City has satisfied its duty of reasonable accommodation under Title VII.[9] The judgment of the district court is therefore affirmed.

AFFIRMED.

POSNER, Chief Judge, concurring.

It is a matter of judgment whether to base the decision of an appeal on a broad ground, on a narrow ground, or on both, when both types of ground are available. If the judges are dubious about the broad ground, then they will do well to decide only on the narrow ground; but if they are confident of the broad ground, they should base decision on that ground (as well as on the narrow ground, if equally confident of it) in order to maximize the value of the decision in guiding the behavior of persons seeking to comply with the law. One of the most important things that appellate courts do is to formulate rules of law. They would formulate very few rules, and leave the law in a state of considerable and avoidable uncertainty, if they always chose to decide a case on the narrowest possible ground. It is true that the broader the ground, the more likely it is to sweep in cases that the judges cannot perfectly foresee, and this argues for caution in deciding cases on broad grounds, because there is greater risk of error, and for a willingness to carve exceptions as new cases imperfectly foreseen arise. But I think that we could prudently have gone further in this case than the majority opinion does to clarify the law governing the duty of public-safety agencies to accommodate the religious beliefs of their employees, rather than leave the law in a state of uncertainty which the majority opinion may actually increase.

---

8. We also cannot accept Officer Rodriguez's assertion that the City is barred from invoking the provisions of the CBA as a reasonable accommodation under generally recognized principles of estoppel and waiver. Officer Rodriguez bases this contention primarily on the Tenth Circuit's holding in *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481 (10th Cir.1989), *cert. denied*, 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990). In *Toledo*, the employer argued that it had satisfied its duty of reasonable accommodation by virtue of a settlement offer it had made to the employee after the initiation of litigation. The Tenth Circuit rejected this argument, holding that the employer could not exonerate itself by relying upon attempts at accommodation after the employee has already suffered some detriment due to the conflict between his religion and his job. *See id.* at 1488. In this case, however, the accommodations available to Rodriguez through the CBA were available prior to his assignment to clinic duty on November 19, 1994 and prior to the initiation of this litigation. Moreover, it is undisputed that Officer Rodriguez was aware of his options under the CBA.

9. Because we have concluded that the City satisfied its duty of reasonable accommodation under Title VII by providing Officer Rodriguez the option to transfer to a different district, we need not reach the "undue hardship" portion of the Title VII analysis.

The ground on which my colleagues have based decision is narrow—that the city made a reasonable effort to accommodate Officer Rodriguez's religious beliefs. It is convincing, but we would be doing a big favor for the bench and bar of this circuit, and for its police and fire departments, and with little risk of error, if we made clear that police officers and firefighters have no right under Title VII of the Civil Rights Act of 1964 to recuse themselves from having to protect persons of whose activities they disapprove for religious (or any other) reasons. Mr. Rodriguez, a Chicago police officer, claims, I have no reason to doubt sincerely, that it violates his religious principles to guard abortion clinics. He is entitled to his view. He is not entitled to demand that his police duties be altered to conform to his view any more than a volunteer member of the armed forces is entitled to demand that he be excused from performing military duties that conflict with his religious faith (I specify "volunteer" because the claim of a conscripted soldier is stronger, see *Welsh v. United States*, 398 U.S. 333, 344, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *United States v. Seeger*, 380 U.S. 163, 185–87, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)), or than a firefighter is entitled to demand that he be entitled to refuse to fight fires in the places of worship of religious sects that he regards as Satanic. The objection to recusal in all of these cases is not the inconvenience to the police department, the armed forces, or the fire department, as the case may be, though that might be considerable in some instances. The objection is to the loss of public confidence in governmental protective services if the public knows that its protectors are at liberty to pick and choose whom to protect.

The public knows that its protectors have a private agenda; everyone does. But it would like to think that they leave that agenda at home when they are on duty—that Jewish policemen protect neo-Nazi demonstrators, that Roman Catholic policemen protect abortion clinics, that Black Muslim policemen protect Christians and Jews, that fundamentalist Christian policemen protect noisy atheists and white-hating Rastafarians, that Mormon policemen protect Scientologists, and that Greek-Orthodox policemen of Serbian ethnicity protect Roman Catholic Croats. We judges certainly want to think that U.S. Marshals protect us from assaults and threats without regard to whether, for example, we vote for or against the pro-life position in abortion cases.

All that an employer must show to avoid liability for religious discrimination in employment is that "he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The Chicago Police Department reasonably accommodated Rodriguez by allowing him to use his accumulated seniority to transfer to a district that does not have an abortion clinic in it. The only inconvenience to Rodriguez is that he would miss the "camaraderie" of the Fourteenth District. This is a trivial inconvenience. But I do not think that the Department was required to accommodate Rodriguez's religious aversion to protecting abortion clinics even to the limited extent that it did. The importance of public confidence in the neutrality of its protectors is so great that a police department or fire department or equivalent public-safety agency that decides not to allow recusal by its employees should be able to plead "undue hardship" and thus escape any duty of accommodation. *Ryan v. Department of Justice*, 950 F.2d 458, 462 (7th Cir.1991); *Beadle v. City of Tampa*, 42 F.3d 633, 637–38 (11th Cir.1995); *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir.1976); cf. *Jones v. City of Gary*, 57 F.3d 1435, 1442 (7th Cir.1995).

Both *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 67, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986), and *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), hold that anything more than a *de minimis* cost to the employer is undue hardship within the meaning of Title VII. It is undue hardship in spades when the necessary accommodation would strike a body blow to the employer's business. When the business of the employer is to protect the public safety, the maintenance of public confidence in the neutrality of the protectors is central to effective performance, and the erosion of that confidence by recognition of a right of recusal by public-

safety officers would so undermine the agency's effective performance as to constitute an undue hardship within the meaning of the statute. Although the principle that public-safety officers have no right to pick and choose on religious or other personal grounds among the people whom they protect applies to all police officers employed by any public police force, including the U.S. Marshals Service, the FBI, and the Secret Service, and to all firefighters employed by public fire departments, I would reserve the case we put at argument of a fire department paramedic who refuses on religious grounds to obey an order by his superiors to withdraw life support from a patient. That would be a case of a public-safety officer insisting on protecting all members of the public rather than refusing to protect some of them. It would thus be a different case from the present one and we need not decide today how it ought to be decided.

Our decision in *Ryan*, which upheld the discharge of an FBI agent who refused on religious grounds to investigate antiwar activists, comes so close to enunciating the principle that I am urging that the failure of the majority opinion even to cite that case may be taken as expressing doubts about the validity of the principle. I hope not, but it is another reason why deciding this case on the broader ground would serve to dispel uncertainty.