**Yvonne SHELTON, Appellant,**

v.

**UNIVERSITY OF MEDICINE & DENTISTRY OF NEW JERSEY; John Doe Owners, (said name being fictitious for various owners); Manny Moe's Corp, (said name being fictitious); ABC Partnerships, (same name being fictitious).**

No. 99–5527.

United States Court of Appeals, Third Circuit.

Argued March 6, 2000.

Filed Aug. 10, 2000.

F. Michael Daily, Jr., (Argued), Quinlan, Dunne & Daily, Merchantville, NJ, Attorney for Appellant.

Barbara A. Berreski, (Argued), Office of Attorney General of New Jersey, Division of Law, Richard J. Hughes, Justice Complex Trenton, NJ, Attorney for Appellee, University of Medicine & Dentistry of New Jersey.

Before: SCIRICA, ALITO and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this employment discrimination case, the issue on appeal is whether a state hospital reasonably accommodated the religious beliefs and practices of a staff nurse who refused to participate in what she believed to be abortions. The District Court held it had, and we agree. We will affirm.

### I. Background

Yvonne Shelton worked as a staff nurse in the Labor and Delivery section of the Hospital at the University of Medicine and Dentistry of New Jersey. The Hospital's Labor and Delivery section provides patients with routine vaginal and cesarean-section deliveries. The Labor and Delivery section does not perform elective abortions.[1] On occasion, Labor and Delivery section patients require emergency procedures that terminate their pregnancies. Labor and Delivery section nurses are required to assist in emergency procedures as part of their job responsibilities.

Shelton is a member of the Pentecostal faith; her faith forbids her from participating "directly or indirectly in ending a life." The proscription includes abortions of live fetuses. Shelton claims she notified the Hospital in writing about her religious beliefs when she first joined the Hospital in 1989, and again in 1994. During this time, the Hospital accommodated Shelton's religious beliefs by allowing her to trade assignments with other nurses rather than participate in emergency procedures involving what Shelton considered to be abortions.

Two events precipitated Shelton's termination. In 1994, Shelton refused to treat a patient. According to the Hospital, the patient was pregnant and suffering from a ruptured membrane (which the Hospital describes as a life-threatening condition). Shelton learned the Hospital planned to induce labor by giving the pa-

---

**1.** The Hospital provides elective abortions on an outpatient basis.

tient oxytocin. Shelton refused to assist or participate.[2]

After the incident, Shelton's supervisor asked her to provide a note from her pastor about her religious beliefs. Instead, Shelton submitted her own note:

> Before the foundations of the earth, God called me to be Holy. For this cause I must be obedient to the word of God. From his own mouth he said 'Thou shalt not kill.' Therefore, regardless of the situation, I will not participate directly or indirectly in ending a life. . . .

In November 1995, Shelton refused to treat another emergency patient. This patient-who was "standing in a pool of blood"—was diagnosed with placenta previa. The attending Labor and Delivery section physician determined the situation was life-threatening and ordered an emergency cesarean-section delivery.[3] When Shelton arrived for her shift, she was told to "scrub in" on the procedure. Because the procedure would terminate the pregnancy, Shelton refused to assist or participate. Eventually, another nurse took her place. The Hospital claims Shelton's refusal to assist delayed the emergency procedure for thirty minutes.

Two months later, the Hospital informed Shelton she could no longer work in the Labor and Delivery section because of her refusal to assist in "medical procedures necessary to save the life of the mother and/or child." The Hospital claimed that

staffing cuts prevented it from allowing Shelton to continue to trade assignments when situations arose she considered would lead to an abortion. The Hospital believed Shelton's refusals to assist risked patients' safety.

But the Hospital did not terminate Shelton. Instead, it offered her a lateral transfer to a staff nurse position in the Newborn Intensive Care Unit ("Newborn ICU"). The Hospital also invited Shelton to contact its Human Resources Department, which would help her identify other available nursing positions.

Shelton undertook her own investigation of the Newborn ICU position. She claims she spoke with a nurse (whose name she does not remember) in that unit, who said that "extremely compromised" infants who were not expected to survive would be "set aside" and allowed to die. Shelton did not attempt to confirm this information with the Hospital. Nor did she contact the Human Resources Department to investigate other available positions. Shelton claims she believed no other positions would be available.

The Hospital gave Shelton thirty days to accept the position in Newborn ICU, or to apply for another nursing position. Shelton did neither. Instead, on the thirtieth day, she wrote to her supervisor:

> . . . The ultimatum given me however, doesn't align with the response I am unctioned to submit. The decision is not ours to make but the Lords'. The Liv-

---

**2.** Shelton maintains that she "refused to participate in a procedure that would end a life." But in support of its summary judgment motion, the Hospital submitted a January 1996 letter it sent to Shelton memorializing a discussion between Shelton and Veronica Anokute, the Nurse Manager of the Labor and Delivery Section, about Shelton's "previous refusal to participate in the use of oxytocin on a preterm pregnancy patient because it was in violation of[her] religious beliefs." In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n. 17 (3d Cir.1995). The District Court apparently accepted this proof of the oxytocin incident. *See Shelton v. University of*

*Medicine and Dentistry of New Jersey*, No. 97–CIV–2689, 1999 WL 706160, at *1 (D.N.J. June 15, 1999). Although we see no error in the court's determination, we rely only on Shelton's admission that she refused to treat the patient.

**3.** The attending Labor and Delivery section physician considered the procedure to be an emergency hysterotomy/hysterectomy. After the incident, the physician submitted a memorandum in which she explained that the patient was 18 weeks pregnant, had experienced periods of bleeding during the pregnancy, and had a complete placenta previa—a condition in which the fetus's placenta completely covers the mother's cervix, risking blood loss.

ing God is in control of that which concerns my life and job. "Many are the plans in a mans heart but it's Gods plan/purpose that will prevail."

On February 15, 1996, the Hospital terminated Shelton.

## II. Proceedings

Shelton sued, claiming violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. (Count I), the New Jersey Law Against Discrimination, N.J.S.A. 10:5 et seq. (Count II), and the First Amendment (Count III). The District Court granted summary judgment for the Hospital on Shelton's federal claims, concluding the Hospital reasonably accommodated Shelton by offering to transfer her to the Newborn ICU and by inviting her to work with its Human Resources Department to identify other available positions. The court declined to continue jurisdiction over Shelton's state law claims. Shelton appealed, claiming the District Court erred by ignoring material issues of fact and by failing to consider the New Jersey Conscience Statute, N.J.Stat.Ann. 2A:65A–1, A–2, A–3 (West 1987).

We have jurisdiction over Shelton's appeal under 28 U.S.C. § 1291. Our review of a summary judgment is plenary. We view all evidence and draw all inferences therefrom in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. See Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir.1999).

## III. Discussion

### A. The Title VII Religious Discrimination Claim

 Title VII of the 1964 Civil Rights Act requires employers to make reasonable accommodations for their employees' religious beliefs and practices, unless doing so would result in "undue hardship" to the employer. 42 U.S.C.§§ 2000e2(a)(1),[4] 2000e(j)[5] (1982). To establish a prima facie case, the employee must show:

1. she holds a sincere religious belief that conflicts with a job requirement;

2. she informed her employer of the conflict; and

3. she was disciplined for failing to comply with the conflicting requirement.

See Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 133–34 (3d Cir.1986) (citations omitted). If the employee establishes a prima facie case, the burden shifts to the employer to show that it made good faith efforts to accommodate, or that the requested accommodation would work an undue hardship. See United States v. Board of Educ., 911 F.2d 882, 886–87 (3d Cir. 1990) (no Title VII violation; allowing Muslim teacher to wear religious garb while teaching, thereby violating state criminal statute, would impose undue hardship on school district); Getz v. Pennsylvania, 802 F.2d 72, 73 (3d Cir.1986) (no Title VII violation; employee failed to establish prima facie case where Commonwealth allowed her to take religious holidays with pay, but did not allow her to work overtime to earn extra vacation time).

The approach employed in Protos and Getz is similar to that employed by many of our sister courts of appeals. See, e.g., Weber v. Roadway Express, Inc., 199 F.3d 270, 273 (5th Cir.2000); Wilson v. U.S.

---

4. It is an unlawful employment practice to "discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of ... religion." 42 U.S.C. § 2000e–2(a)(1) (1982).

5. "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (1982).

*West Communications*, 58 F.3d 1337, 1340 (8th Cir.1995); *Beadle v. Hillsborough Co. Sheriff's Dep't*, 29 F.3d 589, 592, 592 n. 5 (11th Cir.1994); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir.1993); *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 221–22 (6th Cir.1991). Nonetheless, we are mindful that the Supreme Court has declined to accept or reject any particular prima facie case or burden-shifting approach to Title VII religious accommodation cases. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). In *Philbrook*, the Court reviewed a Title VII religious discrimination case in which the Court of Appeals for the Second Circuit had applied a prima facie case test virtually identical to that we now apply (and previously applied in *Protos* and *Getz*, both decided shortly before *Philbrook*). The Court of Appeals had held the employee established his prima facie case. *See id.* at 66, 107 S.Ct. 367. Then, assuming without discussion the employer's policy constituted a reasonable accommodation, the court held that where the employer and employee both propose a reasonable accommodation, the employer must accept the employee's proposal unless doing so works an undue hardship. *See id.* On this latter point the Supreme Court reversed, commenting that it found "no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation." *Id.* at 68, 107 S.Ct. 367. The Court specifically declined to "establish for religious accommodation claims a proof scheme analogous to that developed in other Title VII contexts, delineating the plaintiff's prima facie case and shifting production burdens." *Id.* at 67, 107 S.Ct. 367. The Court reasoned that because the matter had been tried on the merits, the prima facie case issue was not before it. *See id.* at 67–68, 107 S.Ct. 367. Thus, absent further guidance from the Supreme Court, we will continue to apply the prima facie test and burden-shifting approach used in *Protos* and *Getz*.

#### 1. Shelton's Prima Facie Case

■ The District Court held Shelton established a prima facie case. We agree. There is no dispute that Shelton's religious beliefs are sincere, and that the Hospital ultimately terminated Shelton. Although the parties dispute when Shelton first notified the Hospital she would not participate in abortions (Shelton claims she notified the Hospital when she commenced work), they do not dispute the Hospital was on notice by at least 1994. Although the Hospital claims Shelton failed to establish notice because she never provided the requested note from her pastor, we disagree. Under the facts presented, Shelton provided sufficient notice.

#### 2. The Burden Shifts: The Hospital Must Establish A Reasonable Accommodation, or Undue Hardship

Because Shelton established her prima facie case, the burden shifts to the Hospital to show either that it offered Shelton a reasonable accommodation, or that it could not do so because of a resulting undue hardship. *See United States v. Board of Educ.*, 911 F.2d at 886–87. The Hospital claims it satisfied the former.

■ Title VII does not define what is a "reasonable accommodation." But the Supreme Court in *Philbrook* made clear what it need not be: a sufficient religious accommodation need not be the "most" reasonable one (in the employee's view), it need not be the one the employee suggests or prefers, and it need not be the one that least burdens the employee. *Philbrook*, 479 U.S. at 68–69, 107 S.Ct. 367. In short, the employer satisfies its Title VII religious accommodation obligation when it offers any reasonable accommodation. *See id.*

On this point, *Philbrook* provides some guidance. Philbrook was a high school teacher whose union agreement allowed him to take three "religious days" a year. "Religious days" were not charged against paid personal leave, but paid leave could

not be used for extra religious days. *See id.* at 63–64, 107 S.Ct. 367. Philbrook's religious practices caused him to miss approximately six school days a year. *See id.* at 62–63, 107 S.Ct. 367. To resolve the issue, Philbrook proposed that he be allowed either to take additional unpaid personal leave, or to pay for a substitute teacher (and receive his own full pay for the day). *See id.* at 64–65, 107 S.Ct. 367. The school district declined. The district court held Philbrook failed to prove any religious discrimination. On appeal, the Court of Appeals for the Second Circuit reversed, holding when an employer and employee both propose reasonable accommodations, the employee's must be accepted unless shown to work an undue hardship. *See id.* at 65–66, 107 S.Ct. 367. The Supreme Court reversed, rejecting the view that an employer must adopt any particular proposed accommodation: "[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Id.* at 68, 107 S.Ct. 367. As to whether the school district's policy in fact constituted a reasonable accommodation, the Court remanded. *See id.* at 70–71, 107 S.Ct. 367. The Court explained that although the school district's policy seemed to be reasonable—because it eliminated the religious conflict—it would not be so if interpreted to allow paid leave for all purposes except religious ones. *See id.* at 71, 107 S.Ct. 367. Further fact-finding was ordered. *See id.* at 70, 107 S.Ct. 367.

Against this background we analyze the Hospital's proffered accommodations.

**6.** If we address the conflict as Shelton has primarily characterized it-her inability to participate in abortions of live fetuses—the inquiry ends, for Shelton does not dispute that the Newborn ICU does not perform abortions. But in at least one letter to the Hospital Shelton identified the conflict as her inability to "participate in ending a life." Therefore, we will proceed with the analysis.

### a. The Hospital's Offer to Transfer Shelton to the Newborn ICU Position

 Shelton argues there is a fact issue whether the Hospital reasonably accommodated her by offering a transfer to the Newborn ICU. The core of her argument [6] is that the transfer would not have resolved the religious conflict; in the Newborn ICU she would again be asked to undertake religiously untenable nursing actions (or inactions).[7] The Hospital countered Shelton's claim with testimony that infants in Newborn ICU are not denied medical treatment. Carolyn Franklin, the Hospital's Director of Patient Care Services, testified that she had no knowledge that any baby in Newborn ICU had been taken off of life support, or denied nourishment. Furthermore, there is no evidence that if Shelton worked in the unit, she would be asked to deny care to any infant. Indeed, Shelton admitted that her conclusion about what she might be asked to do in the Newborn ICU was self-drawn.

In sum, Shelton has not established she would face a religious conflict in the Newborn ICU. The Hospital's offer of a lateral transfer to that unit thus constituted a reasonable accommodation. *See, e.g., Cook v. Lindsay Olive Growers,* 911 F.2d 233 (9th Cir.1990) (offer of lateral job transfer constituted reasonable accommodation under state religious discrimination law akin to Title VII; summary judgment affirmed). *Cf. Heller,* 8 F.3d 1433 (employer failed to offer reasonable accommodation where after it rescinded previously-granted permission for employee to take day off

**7.** Shelton's assertion is based on inadmissible hearsay and speculation. As noted, hearsay statements can be considered on a motion for summary judgment only if they are capable of admission at trial. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys.,* 63 F.3d at 1275 n. 17. In this case, the record demonstrates that the "evidence" on this point was of doubtful admissibility, because Shelton testified she could not identify the nurse to whom she spoke.

to attend his wife's conversion ceremony, it thereafter made no further accommodation effort before firing him).

**b. The Hospital's Invitation to Shelton to Meet with the Human Resources Department to Identify Other Available Positions**

 In another attempt to accommodate Shelton's religious conflict, the Hospital invited Shelton to meet with its Human Resources Department to discuss other available nursing positions. Once the Hospital initiated discussions with that proposal, Shelton had a duty to cooperate in determining whether the proposal was a reasonable one. *See, e.g., Philbrook*, 479 U.S. at 68–69, 107 S.Ct. 367 (employer-employee cooperation is consistent with Congress's goal of flexibility in the search for a reasonable accommodation; "... courts have noted that 'bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business' " (*quoting Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145–46 (5th Cir.1982))). By refusing to meet with Human Resources to investigate available positions, Shelton failed to satisfy her duty. *See, e.g., Beadle v. Hillsborough Co. Sheriff's Dep't*, 29 F.3d at 593 (employee did not make good faith attempt to accommodate his religious needs through employer's proffered means; employee declined employer's offer to announce need for shift swap during roll call or on departmental bulletin board); *Brener*, 671 F.2d at 145–46 (no Title VII violation where employee did not fully explore employer's proposed religious accommodation).

Shelton does not dispute that at the relevant time, staff nursing positions may have been available in other departments.[8] But she claims her duty to cooperate in finding an accommodation never arose because a transfer to any other department was not a viable option. Not surprisingly, she does not base this claim on any religious conflict. Instead, she claims a transfer to any other department would have required her to "give up eight years of specialized training and education," and to undertake retraining.

The District Court found unconvincing Shelton's claim that a transfer to another staff nurse position would require her to "give up" all of her years of training and education. We agree. Shelton has not come forward with any evidence that a lateral transfer would have affected her salary or benefits. Indeed, Shelton testified that she did not pursue a meeting with Human Resources to identify other lateral transfers because she believed positions were not available.[9] She never expressed a concern that she would be forced to accept a lower salary or benefits. Instead, conceding that a lateral transfer "may have resulted in no immediate economic impact," Shelton offered only the generic speculation that lateral transfers may result in "long-term economic consequences as to the employee's career prospects." Such speculation is insufficient to raise a fact issue precluding summary judgment.

Although there is evidence that Shelton likely would have to undergo some retraining if she took a position outside of the Labor and Delivery section, there is no evidence that she would lose pay or benefits by accepting a new staff nurse position. On this point, the Hospital's Nursing Manager, Edyth Stroud, testified that al-

**8.** The record refers to positions in the Pulmonary and Research Departments. Because the parties provided us only with excerpts of the relevant deposition, and failed to identify the deponent, we are unable to assess further this aspect of the claim.

**9.** Shelton testified that she did not pursue the proposed meeting with Human Resources because, in her view, the Hospital had undergone two layoff periods, a third was "in the wind," and she "didn't see there would be any positions there ... [and] the likelihood of [her] having a position in the hospital was nil."

though a staff nurse who transferred to another nursing unit would need some training, the relocation would not be burdensome. We agree with the District Court that there was no evidence in this case that a lateral transfer would be unreasonable or burdensome.

In sum, Shelton's refusal to cooperate in attempting to find an acceptable religious accommodation was unjustified. Her unwillingness to pursue an acceptable alternative nursing position undermines the cooperative approach to religious accommodation issues that Congress intended to foster.

In a recent case decided by the Court of Appeals for the Seventh Circuit, a police officer refused, on religious grounds, to protect employees of an abortion clinic. *See Rodriguez v. City of Chicago,* 156 F.3d 771 (7th Cir.1998). The officer—Rodriguez—asked to be exempted from further assignments to guard an abortion clinic from protestors. Although the police department declined formally to exempt him, it did allow informal accommodations: Rodriguez's captain avoided assigning him to clinic duty, and Rodriguez took vacation time on the days when clinic patrol was most likely to be assigned. *See id.* at 773–74. Eventually, Rodriguez was assigned to clinic patrol. When he again requested exemption, the on-duty sergeant told him he could not refuse an assignment. Rodriguez took the assignment under protest, then sued under Title VII. The district court granted the police department's motion for summary judgment. The Court of Appeals for the Seventh Circuit affirmed, holding the police department had reasonably accommodated Rodriguez by providing him the opportunity, through a collective bargaining agreement, to transfer to another district, at the same pay and benefit levels. *See id.* at 775. The accommodation was not unreasonable simply be-

cause it would have required Rodriguez to forfeit the right to stay in his district of choice.

It would seem unremarkable that public protectors such as police and firefighters must be neutral in providing their services. We would include public health care providers among such public protectors. Although we do not interpret Title VII to require a presumption of undue burden, we believe public trust and confidence requires that a public hospital's health care practitioners—with professional ethical obligations to care for the sick and injured—will provide treatment in time of emergency.

Shelton refused the Hospital's efforts to accommodate her religious beliefs and practices. Having done so, she cannot successfully challenge those efforts as legally inadequate.

## B. The New Jersey Conscience Statute

■ Shelton contends her refusals to participate in certain procedures were protected in the first instance by the New Jersey Conscience Statute. That statute provides in part:

A–1. No person shall be required to perform or assist in the performance of an abortion or sterilization.

. . .

A–3. The refusal to perform, assist in the performance of, or provide abortion services or sterilization procedures shall not constitute grounds for civil or criminal liability, disciplinary action or discriminatory treatment.

N.J. Stat.Ann. 2A:65A–1, A–2, A–3 (West 1987). Shelton claims the Hospital's actions violated the Conscience Statute. But Shelton did not plead that claim in her complaint.[10] Accordingly, that issue was

10. Although Shelton points out that in her brief opposing summary judgment she discussed the statute and its "effect," she cannot circumvent her failure to plead the alleged statutory violation in the first instance (or to

thereafter have sought to do so), especially where she appears to have argued only that the statute was to be given effect "in claims based upon" the New Jersey Law Against

not before the District Court (which made no mention of the statute in its Opinion), and is not now before us.[11]

### C. First Amendment Claim

██ Shelton also alleges the Hospital violated Shelton's First Amendment right to free exercise of religion by engaging in improper viewpoint discrimination. Specifically, she claims the Hospital fired her because its viewpoint on abortion conflicted with hers. In support of this argument Shelton cites *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). We fail to see how *Rosenberger*—or Shelton's viewpoint argument—applies here. *Rosenberger* dealt with whether a public university violated students' First Amendment free speech rights by providing funds to non-religious student publications, but denying funds to a religious publication. The alleged viewpoint discrimination comprised the university's different treatment of two student publications that espoused different views. Here, Shelton has not attempted to establish that the Hospital treated her differently from any other staff nurse who refused to participate in procedures. Nor does it appear that she could, for the evidence was to the contrary: one of the Hospital's representatives [12] testified that when nurses developed sensitivities to latex gloves and could not perform work in their unit, the Hospital "was able to accommodate some of those situations." Thus, it appears that the Hospital has dealt consistently with nurses who could not or would not refuse to perform their nursing duties, regardless of reason.

In sum, Shelton has failed to establish that the Hospital was anything but neutral

with respect to religion. Thus we see no error in the District Court's grant of summary judgment to the Hospital on Shelton's First Amendment claim.

### IV. Conclusion

For the reasons stated, we will affirm the judgment of the District Court.

---

Discrimination. Under the circumstances, we believe Shelton waived the issue.

**11.** Even had Shelton properly pled the statutory violation, it appears doubtful from the record that she could have established her claim, given the evidence that her termination was caused by her refusals to cooperate with the Hospital. We note, but do not reach, the broader issue of whether the Statute applies

to the Hospital in view of the New Jersey Supreme Court's decision in *Doe v. Bridgeton Hosp. Assoc., Inc.*, 71 N.J. 478, 366 A.2d 641 (N.J.1976) (Conscience Statute does not apply to defendant non-sectarian non-profit hospital, which Court considered to be a quasi-public institution).

**12.** The parties did not identify the deponent.