John C. RYAN, Plaintiff–Appellant,

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant–Appellee.**

No. 91–1467.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 15, 1991.

Decided Dec. 9, 1991.

Arthur G. Greenberg (argued), Jeremy H. Heiple, Westervelt, Johnson, Nicoll & Keller, Peoria, Ill., for plaintiff-appellant.

David Hoff, Asst. U.S. Atty., Danville, Ill., James A. Lewis, Asst. U.S. Atty. (argued) Springfield, Ill., for defendant-appellee.

Before CUMMINGS, WOOD, Jr., and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Incidents of vandalism at military recruiting facilities in October 1986 were accompanied by messages linking the destruction to pacifist groups. The next month the FBI issued a memo identifying the groups "Veterans Fast for Life" and "Plowshares" as potentially responsible and instructing agents "to contact logical law enforcement departments and other sources deemed appropriate to determine any similar incidents." A copy came to John C. Ryan, who was in charge of domestic security and terrorism investigations at the FBI's office in Peoria, Illinois. Ryan replied with a memo of his own:

> Because of writer's personal, religious, and human beliefs concerning the issues that appear to be involved, writer is not willing to conduct this lead or be involved in this case and feels the FBI is ill-advised to be so involved in this case as a Domestic Security/Terrorism; Sabotage case based on the following reasons:
>
> 1. The acts performed by the "PLOWSHARES" Group, although clearly involving Destruction of Government Property, have been consistently non-violent symbolic statements against violence. . . .

Agent James Swinford volunteered to swap assignments with Ryan. He declined. An agent had taken off Ryan's hands an earlier order to investigate a group of peace activists including nuns and priests; this time Ryan chose confrontation. Thomas Jones, then the agent in charge of the Springfield, Illinois, office (of which the Peoria office is a branch), expressly instructed Ryan to carry out the order, adding that refusal "would leave me no choice but to initiate insubordination proceedings against you." Ryan replied: "Writer's stance remains as set forth".

Jones charged Ryan with insubordination, and the FBI commenced a lengthy

process of recommendations and responses by multiple layers of the bureaucracy. In August 1987 the file reached John D. Glover, the Executive Assistant Director of the FBI and its highest authority in personnel matters. Glover fired Ryan, concluding (as he later testified) that refusal to carry out a lawful direct order is unpardonable—especially as Ryan would not promise to conduct future investigations into the activities of antiwar groups and expressed doubt whether he could arrest persons unlawfully demonstrating at a local military facility. Ryan, an agent with 21 years of exemplary service, was sacked only nine months before his 50th birthday, when he would have been eligible to retire with immediate pension. Ryan now must wait until he turns 62 before beginning to receive a (smaller) pension. The present value of the loss is approximately $500,000.

Ryan pursued his administrative remedies. First an administrative law judge, and then the Merit Systems Protection Board, concluded that discharge is an appropriate response to refusal to investigate, and that the FBI is not obliged to accommodate religious beliefs that interfere with its mission. The district court, reviewing the administrative record under 5 U.S.C. § 7703(b)(2), concluded that the MSPB's decision is consistent with law and supported by substantial evidence. Next the court held a trial *de novo* on Ryan's complaint of religious discrimination under Title VII of the Civil Rights Act of 1964. The district court concluded that the FBI did not discriminate against Ryan on account of his beliefs but instead had enforced a neutral, reasonable rule. Glover testified at the trial that he had agonized over the decision in light of Ryan's good record and proximity to eligibility for retirement but concluded in the end that the Bureau could not tolerate agents who insisted, for any reason, on being able to choose among assignments. Never in the history of the FBI had an agent flatly refused to carry out an investigation; Glover decided not to allow the camel's nose inside the tent. The district court wrote: "[T]he sincerity of the witness Glover and his reluctance to do what he did was evi-

dent. Nothing in the record describing the actions of Mr. Ryan's fellow agents suggests that they were motivated in any way by religious discrimination."

Ryan, a Roman Catholic, believes that the U.S. Bishops' Pastoral Letter on War and Peace, issued May 3, 1983, shows the impropriety of conducting investigations into groups that destroy governmental property to express their opposition to violence. The Pastoral Letter states in part:

> Peacemaking is not an optional commitment. It is a requirement of our faith. We are called to be peacemakers, not by some movement of the moment, but by our Lord Jesus. The content and context of our peacemaking is set not by some political agenda or ideological program, but by the teaching of His church.

In the fall of 1983 Ryan told his immediate superior that this letter might affect his ability to handle particular assignments. Ryan's sincerity is unquestioned. He did not, however, ask to be relieved of his assignment in domestic security and terrorism. That put him on a collision course with the FBI, for it was inevitable that he would from time to time receive assignments relating to persons opposed to military activities. Ryan's religious beliefs prevent him from investigating anti-military activity that is not characterized by violence. Ryan believes that the persons and groups he was asked to investigate in November 1986 are committed to nonviolent (albeit illegal) acts. When Ryan replied to the directive with formal disobedience rather than a request to be relieved of the assignment, he invited a formal reply. He did not expect the reply he received and contends that dismissal is too severe—indeed, that any discipline is too severe.

■ Ryan submits that discharge is a brutal response to a religiously motivated refusal to accept a single assignment. Judicial review of the MSPB's decision is deferential, 5 U.S.C. § 7703(c), and we agree with the district judge that substantial evidence supports its decision. Ryan repeatedly refused to carry out a lawful order to investigate an unsolved federal offense; he declined to swap assignments;

he would not promise to carry out similar orders in the future and implied that he would refuse to participate in related matters (such as arrests of persons engaging in illegal, but nonviolent, protests). A law enforcement agency is entitled to insist that its agents follow orders. Obedience is a high value in such an organization. Cf. *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986).

Whether tolerating Ryan's disobedience and that of other agents with sincere religious claims would contribute to a breakdown in discipline, and whether transferring such an agent to an assignment where nonviolent protests are not a potential issue would hinder the efficient operation of the FBI, are subjects about which reasonable persons can and do differ. The MSPB is entitled to accept the FBI's views on such matters; once the Board did so, the district court properly enforced its decision. Ryan argues as if we were the MSPB, considering the twelve factors identified in *Douglas v. Veterans Administration,* 5 M.S.P.B. 313, 5 M.S.P.R. 280, 305–06 (1981). We are not. The Board considered its own criteria and did not transgress any legal rule in reaching its conclusion.

After *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), any argument that failure to accommodate Ryan's religiously motivated acts violates the free exercise clause of the first amendment is untenable. *Smith* holds that rules neutral with respect to religion satisfy that clause. The FBI did not hold Ryan's faith against him; it judged his deeds, not his beliefs, and treated him no more severely than it would have treated an agent who refused a direct order for secular reasons. Title VII requires of the FBI more than the Constitution in its own right. An employer may not discriminate on account of religion—that is to say, may not use an employee's religion as a ground of decision. 42 U.S.C. § 2000e–16(a). Section 701(j), 42 U.S.C. § 2000e(j), provides that religion "includes all aspects of religious observance and practice ... unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." See generally *Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). Religiously motivated selectivity in the work one is willing to perform is an "aspect of religious observance and practice" that the employer must disregard unless it demonstrates that it is "unable to reasonably accommodate ... without undue hardship". See *Baz v. Walters,* 782 F.2d 701 (7th Cir.1986).

Reallocation of work between agents is the most obvious accommodation, one that Ryan's fellow agents had arranged for him before. Because Ryan refused Swinford's offer to arrange for a swap this time, we need not decide whether a series of swaps—potentially calling for training a different agent in the techniques of domestic security investigations—would create "undue hardship" for the FBI as *Hardison* defines that term: "To require [the employer] to bear more than a *de minimis* cost ... is an undue hardship." 432 U.S. at 84, 97 S.Ct. at 2277 (footnote omitted). Accord, *Ansonia,* 479 U.S. at 67, 107 S.Ct. at 371. Ryan proposed no course other than discontinuing investigations of the sort to which he is opposed, which would be capitulation rather than accommodation. *Ansonia* tells us, however, that the employee's proposals are not the measure of the employer's obligation, 479 U.S. at 68–69, 107 S.Ct. at 371–72, and Ryan blames the FBI for the lack of strategies to accommodate his beliefs. He insists that Title VII requires the FBI to negotiate with him about accommodation. There are two problems with his argument: first, Title VII requires employers to act, not talk (it is not a collective bargaining law); second, the disciplinary process that stretched from December 1986 through August 1987 included many opportunities for Ryan to state his views orally and in writing—which he did, at length. That he did not use this opportunity to propose a concrete method of accommodation is his own choice.

Assistant Director Glover testified that he considered six options: (1) doing nothing; (2) sending Ryan a letter of censure; (3) suspending Ryan for 14 days, as agent Jones recommended; (4) moving Ryan to the Springfield office and assigning him to different work; (5) demoting Ryan to a lower grade; (6) discharging Ryan. (He did not consider reassigning Ryan to different work at Peoria because that office, with only five agents, is so small.) Only options (1) and (4) could be called accommodations. A mild penalty is not accommodation of any kind, because it implies that the conduct may be forbidden and, if continued, will end in discharge.

Glover rejected "doing nothing" because he thought disobedience inconsistent with the mission of the FBI. He rejected reassignment because of the costs of transfer, including its effect in undermining the authority of the special agent in charge and potential effects on morale. The district judge summarized Glover's reasoning: "[I]t is difficult to create special work within a field office where other agents are required to handle all work that is assigned to them." Moving an agent to another office entails "more than a *de minimis* cost". If transfers of work shifts at one place of business are undue hardship to the employer, as the Court held in *Hardison,* then transfer to another city and retraining for different work also pose undue hardship.

Sympathy for a dedicated agent trapped between his career and his faith comes easily. Perhaps the FBI would have shown greater forbearance had Ryan promised to retire when he turned 50. But he did not want to retire. Even now he seeks reinstatement. It is difficult for any organization to accommodate employees who are choosy about assignments; for a paramilitary organization the tension is even greater. Conscientious objectors in the military seek discharge, which accommodates their beliefs and the military's need for obedience. Ryan received discharge but does not want it. He wants to be an agent and to choose his assignments too. With good will all around, and flexibility on the part of Ryan's fellow agents, it just might be possible to make a go of it. Title VII does not, however, compel the FBI to attempt this. Legal institutions lack the sense of nuance that will tell an experienced agent how far the rules may be bent without injury to the FBI's mission. Compelled, as it is by Title VII, to have one rule for all of the diverse religious beliefs and practices in the United States, the FBI may choose to be stingy with exceptions lest the demand for them overwhelm it.

AFFIRMED.