In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 02-1247

BENJAMIN P. ENDRES, JR.,

*Plaintiff-Appellee,*

*and*

UNITED STATES OF AMERICA,

*Intervening Plaintiff-Appellee,*

*v.*

INDIANA STATE POLICE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:01-CV-0518—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

No. 02-1377

PATRICIA HOLMES,

*Plaintiff-Appellee,*

*and*

UNITED STATES OF AMERICA,

*Intervening Plaintiff-Appellee,*

*v.*

MARION COUNTY OFFICE OF FAMILY AND CHILDREN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 00-0677-C-M/S—**Larry J. McKinney**, *Chief Judge*.

_____

ARGUED NOVEMBER 1, 2002—DECIDED JUNE 27, 2003

_____

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Benjamin Endres lost his job with the Indiana State Police after he refused to work at a casino, an enterprise that contravenes his religious beliefs. Patricia Holmes, an employee of Indiana's child-welfare system, took two days of paid leave rather than comply with a directive to remove a headwrap required by her faith. Endres and Holmes have sued under Title VII of the Civil Rights Act of 1964, contending that Indiana discriminated against them on account of their religion. Plaintiffs rely on a definition in §701(j) of that Act, 42 U.S.C. §2000e(j), which provides that religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

Both defendants concede that they have a duty not to discriminate against any religious faith but rely on *Employment Division v. Smith*, 494 U.S. 872 (1990), for the proposition that they need not accommodate religiously inspired practices adversely affected by rules that are neutral with respect to religion. To the extent an accommodation requirement extends beyond the first amend-

ment, defendants insist, it rests on the Constitution's commerce clause and not on §5 of the fourteenth amendment. That does not undermine §701(j)'s validity as applied to state employees, see *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), but does affect where litigation must occur—for, when Congress acts only under the commerce power, the eleventh amendment permits states to insist that suit be in state court. Compare *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), with *Seminole Tribe v. Florida*, 517 U.S. 44 (1996). In *Boerne v. Flores*, 521 U.S. 507 (1997), the Court concluded that the Religious Freedom Restoration Act, 42 U.S.C. §2000bb to §2000bb-4, exceeds the power granted by §5 and therefore may not support a private action in federal court against a state. Defendants submit that §701(j), which like the RFRA requires accommodation rather than neutrality, also is not §5 legislation. After the United States intervened to defend the constitutionality of Title VII, each district judge rejected Indiana's argument and held that litigation may proceed in federal court. *Endres v. Indiana State Police*, No. 3:01-CV-0518 (N.D. Ind. Dec. 28, 2001) (unpublished order); *Holmes v. Marion County Office of Family and Children*, 184 F. Supp. 2d 828 (S.D. Ind. 2002). Defendants took interlocutory appeals. See *Lapides v. University of Georgia*, 535 U.S. 613 (2002); *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993). We consolidated the cases for briefing and argument.

**I**.

Endres joined the State Police in 1991. After Indiana began to license casinos, the State Police designated some of its officers as Gaming Commission agents. In March 2000 Endres was assigned to a full-time position as an agent at the Blue Chip Casino in Michigan City, Indiana. Endres worships at the Community Baptist

Church in South Bend; he and other congregants believe they must neither gamble nor help others to do so, because games of chance are sinful. Endres told the State Police that providing law-enforcement services at a casino would violate his religious beliefs because it would facilitate gambling. He asked for a different assignment; the State Police declined. Endres then refused to report for duty and was fired for insubordination. The record does not reflect why Endres was deputed as a Gaming Commission agent, but he does not contend that this occurred because of, rather than in spite of, his religiously based opposition to gambling. See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979). Nor did the State Police hold his views against him; it responded to his deeds, not his faith, and Endres does not contend that he was treated more severely than he would have been had he refused the same assignment for secular reasons. As a result, neither the posting nor the decision not to accommodate Endres's desire for different duties violated the free exercise clause of the first amendment, as *Smith* understands that clause.

Before taking up the question whether §701(j) is an exercise of §5 powers, we first inquire whether §701(j) obliges states to afford the sort of accommodation that Endres requested. A negative answer will enable the court to avoid a constitutional issue, which makes it prudent to follow the model that the Supreme Court established in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), for qualified-immunity appeals by state actors: determine whether the complaint states a claim before inquiring whether the defendants have immunity. Because the eleventh amendment does not curtail subject-matter jurisdiction (if it did, states could not consent to litigate in federal court, as *Lapides* holds that they may), a court is free to tackle the issues in this order, when it makes sense to do so, without violating the rule that jurisdic-

tional issues must be resolved ahead of the merits. See *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 778-80 (2000).

Endres contends that §701(j) gives law-enforcement personnel a right to choose which laws they will enforce, and whom they will protect from crime. Many officers have religious scruples about particular activities: to give just a few examples, Baptists oppose liquor as well as gambling, Roman Catholics oppose abortion, Jews and Muslims oppose the consumption of pork, and a few faiths (such as the one at issue in *Smith*) include halluci-nogenic drugs in their worship and thus oppose legal prohibitions of those drugs. If Endres is right, all of these faiths, and more, must be accommodated by assigning believers to duties compatible with their principles. Does §701(j) require the State Police to assign Unitarians to guard the abortion clinic, Catholics to prevent thefts from liquor stores, and Baptists to investigate claims that supermarkets mis-weigh bacon and shellfish? Must prosti-tutes be left exposed to slavery or murder at the hands of pimps because protecting them from crime would en-courage them to ply their trade and thus offend almost every religious faith?

The Supreme Court held in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), that §701(j) does not require an accommodation that would cause more than minimal hardship to the employer or other employees. See also *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 67-69 (1986). Juggling assignments to make each compati-ble with the varying religious beliefs of a heterogeneous police force would be daunting to managers and difficult for other officers who would be called on to fill in for the objectors. Whether or not a paramilitary organiza-tion could accommodate task-specific conscientious objec-tion without undue hardship, however, the demand would not be reasonable—and §701(j) calls only for reason-

able accommodations. Reasonableness and the avoidance of undue hardship are distinct. Cf. *Vande Zande v. Wisconsin Department of Administration*, 44 F.3d 538 (7th Cir. 1995) (discussing the difference between "reasonable" accommodation and "undue hardship" under the Americans with Disabilities Act). Selective objection to some of the employer's goals raises problems on the "reasonableness" branch as well as the "undue hardship" branch. See *Reed v. Great Lakes Cos.*, No. 02-3371 (7th Cir. May 30, 2003).

This is the third time we have had to consider how §701(j) applies to requests by law-enforcement personnel to choose which crimes they will investigate and which potential victims they will protect. In *Ryan v. Department of Justice*, 950 F.2d 458 (7th Cir. 1991), an FBI agent claimed a right to be free of any assignment concerning nonviolent opposition to military activities—such as, for example, protesters who vandalize military installations, see *United States v. Urfer*, 287 F.3d 663 (7th Cir. 2002), or pour blood on military records, see *United States v. Berrigan*, 437 F.2d 750 (4th Cir. 1971). Agent Ryan's views stemmed from the U.S. Bishops' Pastoral Letter on War and Peace; his sincerity was not in doubt. Nonetheless, we held, §701(j) did not protect him from discharge for insubordination:

> It is difficult for any organization to accommodate employees who are choosy about assignments; for a paramilitary organization the tension is even greater. Conscientious objectors in the military seek discharge, which accommodates their beliefs and the military's need for obedience. Ryan received discharge but does not want it. He wants to be an agent and to choose his assignments too. With good will all around, and flexibility on the part of Ryan's fellow agents, it just might be possible to make a go of it. Title VII does not, however, compel the FBI to attempt this. Legal institutions lack the

> sense of nuance that will tell an experienced agent how far the rules may be bent without injury to the FBI's mission. Compelled, as it is by Title VII, to have one rule for all of the diverse religious beliefs and practices in the United States, the FBI may choose to be stingy with exceptions lest the demand for them overwhelm it.

950 F.2d at 462. Our second case was *Rodriguez v. Chicago*, 156 F.3d 771 (7th Cir. 1998). Rodriguez, like Ryan a Roman Catholic, refused to protect abortion clinics and their clients. Again the sincerity of his views was unquestioned; again the officer lost, this time because an accommodation had been offered in the form of an opportunity to transfer to a precinct without abortion clinics (which avoided the need to determine whether the offer had been required). Chief Judge Posner filed a concurring opinion addressing the question that the majority had ducked and concluding, in part on the authority of *Ryan*, that agencies such as police and fire departments designed to protect the public from danger may insist that *all* of their personnel protect *all* members of the public—that they leave their religious (and other) views behind so that they may serve all without favor on religious grounds. That is, after all, an obligation both state law and the Constitution fasten on the police. If police and fire departments must enforce the law and protect potential victims free of religious favoritism, then they may insist that all members of their forces (volunteers rather than conscripts) do their parts in fulfilling this duty. "[P]ublic protectors such as police and firefighters must be neutral in providing their services." *Shelton v. University of Medicine & Dentistry*, 223 F.3d 220, 228 (3d Cir. 2000).

Perhaps one could say that *Ryan* does not *compel* this conclusion; agent Ryan had been offered one form of accommodation (a swap of assignments with a fellow agent), and officer Endres lacked any similar way out. Yet what

principally led to Ryan's discharge (as opposed to lesser discipline) was his failure to follow a direct order, coupled with a claim of entitlement in the future to choose which crimes would be investigated and which potential victims protected. Endres has made the same claim of entitlement as Ryan did; it is, we hold, a claim that it would be unreasonable to require any police or fire department to tolerate.

Law-enforcement agencies need the cooperation of all members. Even if it proves possible to swap assignments on one occasion, another may arise when personnel are not available to cover for selective objectors, or when (as in *Hardison*) seniority systems or limits on overtime curtail the options for shuffling personnel. Beyond all of this is the need to hold police officers to their promise to enforce the law without favoritism—as judges take an oath to enforce *all* laws, without regard to their (or the litigants') social, political, or religious beliefs. Firefighters must extinguish all fires, even those in places of worship that the firefighter regards as heretical. Just so with police.

> The public knows that its protectors have a private agenda; everyone does. But it would like to think that they leave that agenda at home when they are on duty—that Jewish policemen protect neo-Nazi demonstrators, that Roman Catholic policemen protect abortion clinics, that Black Muslim policemen protect Christians and Jews, that fundamentalist Christian policemen protect noisy atheists and white-hating Rastafarians, that Mormon policemen protect Scientologists, and that Greek-Orthodox policemen of Serbian ethnicity protect Roman Catholic Croats. We judges certainly want to think that U.S. Marshals protect us from assaults and threats without regard to whether, for example, we vote for or against the pro-life position in abortion cases.

*Rodriguez*, 156 F.3d at 779 (Posner, C.J., concurring). And, we add, that Baptist policemen protect gamblers from theft and fraud (and casino operators from sticky-fingered gamblers and employees). Cf. *Gillette v. United States*, 401 U.S. 437 (1971) (selective conscientious objection does not excuse military service).

Endres advanced a claim under 42 U.S.C. §1983 as well as one under Title VII. The Indiana State Police, as a unit of state government, is not a "person" as §1983 uses that term and therefore is not amenable to a suit for damages under that statute. See *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). There is no point in remanding to allow Endres to fix this problem by adding other defendants. His claim under the free exercise clause is incompatible with *Smith*, and only §701(j) offered any prospect of success. The district court's disposition of Endres's suit therefore is reversed outright; his complaint fails to state a claim on which relief may be granted.

## II

Holmes has a much better claim for accommodation. Her complaint, the only thing we have to go on, alleges: "August 13, 1998, I wore a geles (headwrap) as part of my religious practice. My supervisor, Teresa Howard, informed me if I didn't remove my headgear I would be written up for insubordination for violating a dress code policy. I informed Ms. Howard that due to religious reasons I could not take my geles off. I had to take two vacation days to avoid being disciplined." Although the Constitution does not compel a public employer to allow religious headcoverings that violate neutral dress codes, see *Goldman v. Weinberger*, 475 U.S. 503 (1986); *Menora v. Illinois High School Association*, 683 F.2d 1030 (7th Cir. 1982), toleration of religious diversity in this respect is a wise policy in a pluralistic society. See *United States v. James*,

328 F.3d 953, 957-58 (7th Cir. 2003). Accommodation would be reasonable. Whether Indiana could establish "undue hardship" is not at issue this early in the case. It is enough to say that the complaint survives any challenge under Rule 12(b)(6), so we must decide whether further litigation takes place in state rather than federal court.

### A

Before doing this, however, we need to say more about our own jurisdiction. There are two potential problems, even taking as given the holding of *Lapides* and *Puerto Rico Aqueduct & Sewer Authority* that a state's invocation of the eleventh amendment normally permits an interlocutory appeal.

The first is that the case is in federal court to stay. Holmes alleged, after the language we have quoted: "Other employees wore headgear or hats and were not threatened as I was." That disparate-treatment claim does not depend on the accommodation rule in §701(j). Indiana concedes that it may be litigated in federal court, because Title VII is §5 legislation to the extent it enforces the Constitution's own rule against religious discrimination. One may wonder what sense it makes to entertain an interlocutory appeal about a single line of legal argument even though another legal theory requires the same defendant to litigate in the same court no matter how the appeal comes out. Holmes advances only one claim for relief, supported by multiple legal theories, each of which (if successful) would lead to the same money damages: two days' pay. But *Behrens v. Pelletier*, 516 U.S. 299, 311-12 (1996), says that an interlocutory immunity appeal may contest a single theory of liability, even though success will not end the case, at least if the potential relief differs—and Holmes's victory on an accommodation theory would lead to

prospective relief different from what would follow victory on a disparate-treatment theory. After *Behrens*, the fact that a defendant is not asserting an unqualified "right not to be tried in federal court" does not preclude an interlocutory appeal based on a claim of immunity.

Second, and more complex, is the question whether the Marion County Office of Family and Children, the defendant in Holmes's suit, *is* the State of Indiana. If, as its name implies, it is a unit of county rather than state government, then it gets no benefit from the eleventh amendment, see *Lincoln County v. Luning*, 133 U.S. 529 (1890), and is amenable to suit in federal court whether or not §701(j) "enforces" the fourteenth amendment. See *University of Alabama v. Garrett*, 531 U.S. 356, 368 (2001).

Twenty-five years ago we ruled that Indiana's county welfare departments are not "the state" for purposes of the eleventh amendment. See *Mackey v. Stanton*, 586 F.2d 1126, 1130-31 (7th Cir. 1978). In 1986 Indiana revised the organization of its child-welfare system; county welfare departments became county offices of family and children, and their workers became state employees. *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 732-33 (7th Cir. 1994), holds that these changes do not affect *Mackey*'s conclusion: these organizations still are units of local rather than state government, principally because the money to pay for child-welfare services comes from local taxes.

Relying on *J.A.W. v. Indiana*, 687 N.E.2d 1202 (Ind. 1997), the state asks us to overrule *Baxter*. The Supreme Court of Indiana concluded in *J.A.W.* that we misunderstood how the state's child-welfare system is organized after the 1986 legislation. That law, *J.A.W.* concluded, made all family-welfare officials full-fledged state employees in a chain of command that extends to the Governor. All of these workers are paid directly from the state treasury.

County offices are part of the state in such a structure in the same way the Indianapolis office of the Department of Health and Human Services is part of the federal government. Some taxes to raise funds for welfare benefits are collected at the local level, but *J.A.W.* holds that the county acts in this respect as an agent of the state: "county governments were largely rendered tax collectors for the State" (687 N.E.2d at 1213). "When the county departments were transformed into subordinate agencies of the state[ ] in 1986, the county governments became—with respect to these activities—financial agents of the state. We so hold as a matter of state law." *Id*. at 1215.

Indiana's system brings to mind the way the United States apportioned direct taxes among the states before the sixteenth amendment. Sharing of authority among units of government complicates both practical administration and legal characterization. Even if as a matter of state law the counties act as agents of the state in raising and remitting revenues, it remains a matter of federal law whether this makes each county's department part of the state. See *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994). The dispositive question is more "who pays?" than "who raised the money?". See *University of California v. Doe*, 519 U.S. 425 (1997) (if state pays, the fact that the money came to the state from the federal Treasury does not matter). We need not decide whether *J.A.W.* alone would cause us to overturn the holding of *Baxter*, however, because Indiana changed its law again in 2000.

*Baxter* relied principally on I.C. 12-19-3-2, which established a welfare fund in each county. The fund was raised by a tax on all taxable property in the county, plus the issuance of bonds secured by future property taxes, see I.C. 12-19-3-12 through 12-19-3-16. These provisions were repealed effective January 1, 2000, by I.C. 12-19-1-21. Counties still have the ability to levy taxes to fund certain

services (the fund is called the "family and children's fund"), but that money is used only for "child services." I.C. 12-19-7-3. "Child services" is a defined term, see I.C. 12-19-7-1, that does not include any personnel or administrative costs. These come exclusively from the state treasury. See I.C. 12-19-1-8 and 12-19-1-9. The damages Holmes seeks therefore would be paid by the state itself. (The events of which she complains occurred in 1998, but Indiana charges damages against current appropriations.) The combination of *J.A.W.* and the 2000 legislation leads us to conclude that county offices of family and children in Indiana now must be classified as part of the state for purposes of the eleventh amendment. This does not require the overruling of *Baxter*, which dealt with superseded legislation. It is enough to say that the statutes now in force make county offices part of the state, as *J.A.W.* held and as the formal organization chart now shows them.

**B**

Thus we arrive at the question whether a claim against a state, based on the accommodation clause of §701(j), may be litigated in federal court. The parties' dispute concerns venue, not substance: it is the validity of §701(a), to the extent it authorizes private parties to sue a state in federal court, and *not* the validity of §701(j), that is at issue—for legislation based on the commerce clause may be applied to states (as employers) via suits brought by the federal government in federal court, or via private suits in state courts that are already open to litigation against the state. See *Alden v. Maine*, 527 U.S. 706 (1999).

Indiana's argument is a simple one. Section 5 of the fourteenth amendment authorizes Congress to "enforce" the other provisions of that amendment. A requirement of accommodation does not "enforce" the free exercise clause (applied to the states by §1 of the fourteenth amendment),

for *Smith* holds that a state complies with the free exercise clause by maintaining neutrality toward religiously motivated practices. Accommodation means *departure* from neutrality, and *Boerne* accordingly holds that the Religious Freedom Restoration Act is not based on the power to "enforce" the fourteenth amendment. In *Boerne* not a single Justice thought that a statutory demand for accommodation could be deemed a law to "enforce" the free exercise clause as *Smith* had interpreted it; the only seriously debated question was whether to overrule *Smith* (which the Court did not do). Likewise *Garrett* holds that the Americans with Disabilities Act, to the extent it requires accommodation rather than disregard of disabilities, does not rest on the §5 enforcement power. See also *Erickson v. Northeastern Illinois University*, 207 F.3d 945 (7th Cir. 2000). Indiana asks us to equate accommodation under §701(j) with accommodation under the RFRA and the ADA.

Plaintiffs and the United States reply that §701(j) can be enforcement legislation even though it departs from the Constitution's own rules, provided that it is "congruent and proportional" to them—in other words, that it is a reasonable way to prevent evasions of constitutional rules. See *Nevada Department of Human Resources v. Hibbs*, 123 S. Ct. 1972 (2003), which holds that the family-leave provisions of the Family and Medical Leave Act may be sustained under the §5 power because they root out sex-based stereotypes. The Court stressed in *Hibbs* that Congress compiled a legislative record showing that many states used to discriminate explicitly on account of sex and may continue to do so (either subconsciously or deliberately but in disguise) in the absence of preventive legislation. Family leave is "congruent" to the constitutional rule because designed to reduce the scope for stereotypical thinking and "proportional" because it imposes a modest requirement: family leave is limited in

time and is unpaid. Limits built into §701(j) satisfy the proportionality element of this analysis: §701(j) demands much less of a state than the RFRA did (and less than the FMLA does, too). The RFRA demanded that the state show a compelling interest, while under *Hardison* even a slight burden is "undue hardship." Yet the employer's burden under §701(j) is identical to that under the ADA, which *Garrett* held to be unsupported by §5. So we must inquire whether §701(j) is "congruent" to the free exercise clause, even though the RFRA was not (and the ADA's accommodation rule has been held not congruent to the equal protection clause).

The idea behind "congruence" is that Congress may respond to a history of concealable violations by adopting precautionary rules that reduce either the chance of evasion or the influence of lingering stereotypical beliefs. Congress can't change the constitutional rule of decision, but it may add teeth so that the Constitution's rule has practical bite. Many violations of the equal protection clause are concealable, for disparate impact is not actionable, and the disparate-treatment rule requires proof of intent to use the forbidden characteristic. See, e.g., *Washington v. Davis*, 426 U.S. 229 (1976). When stereotypical thinking underlies a decision, the line between disparate treatment and disparate impact blurs, and it may be difficult indeed to prove a claim. The Court held in *Hibbs* that, when a history of real discrimination has been documented, §5 permits Congress to address established patterns of stereotypical thinking without requiring proof of discriminatory intent.

Section 701(j) does not fit that model. Discrimination by public employers against their employees' religiously inspired practices does not have the same history as discrimination on account of race or sex, and states rarely have resorted to legislation with a veneer of neutrality designed to mask a forbidden discriminatory plan. *Church*

*of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), offers one of the few examples—and as it was not enough to persuade the Court that the RFRA matches a constitutional problem, it is hard to see why §701(j) would be congruent to a constitutional problem. (Note that *Lukumi Babalu Aye* itself had nothing to do with employment by state agencies.) *Hibbs* stressed that, before enacting the FMLA, Congress had compiled a record of subtle sex discrimination reflected in employers' leave policies. Before enacting Title VII, Congress had not compiled such a record of subtle discrimination against religious practices. In 1964 the legislature concentrated on race discrimination; religion and sex were afterthoughts. There was no legislative record at all in the Senate, where the bill was not referred to committee, lest it be bottled up by opponents.

The United States concedes that before enacting Title VII Congress did not compile *any* legislative record on the question whether states were violating their constitutional obligations with respect to religious practices in public workplaces. If the history were written elsewhere for all to see, as the history of race and sex discrimination is, then the lack of a legislative record could not matter. Often a "legislative record" reflects only the ability of advocacy groups to have favorable tidbits recited by tame witnesses during staged hearings. Members of Congress are not professional historians; they do not conduct scholarly research or even make findings after the fashion of juries. Legislative "records" are compiled but not evaluated, voted on, or presented to the President (or the judiciary) for approval. Section 5 does not condition legislative power on the ability of interest groups or committee chairmen to ladle anecdotes into hearing transcripts. Legislative power under §5 depends on the state of the world, not the state of the Congressional Record.

Yet the Executive Branch did not file in this court a brief that supplies the details missing from the legislative record; nor does the United States' brief point to any scholarly writings that illuminate the history. We have been given no reason whatever to think that subtle, hard-to-catch, discrimination against religious practices is now, or ever has been, a problem in state employment. Although hostility to Catholicism was common in many states during the nineteenth century, and some states adopted local versions of the Blaine Amendment, see *Mitchell v. Helms*, 530 U.S. 793, 828-29 (2000) (plurality opinion), that period was behind us long before the enactment of Title VII. For much of the twentieth century, public employers *counteracted* religious discrimination in the private sector, hiring those who had difficulty finding private jobs suited to their skills. The foundation for a decision such as *Hibbs* is missing with respect to §701(j).

Logic does not furnish what history lacks. An accommodation requirement does not reinforce the constitutional approach; to the contrary, neutrality (which is both necessary to avoid disparate treatment and, under *Smith*, sufficient to avoid any violation) differs substantially from accommodation. Neutrality is blind to religion; accommodation requires consciousness of religion and entails a demand that believers and non-believers receive different treatment. One Justice believes that, for this reason, accommodation is itself a violation of the establishment clause. See *Boerne*, 521 U.S. at 536-37 (Stevens, J., concurring). Though this is a minority view, all of the other Justices recognize that there is a difference and a potential tension between an anti-discrimination rule and an accommodation requirement. So in the absence of some need to use accommodation to counteract evasions of the anti-discrimination principle, §701(j) cannot be called an ancillary rule that is congruent with the constitutional norm that Congress is entitled to enforce. This

means that §701(j) rests on the commerce clause alone, and that §701(a) therefore may not be used to compel a state to defend in federal court a private suit seeking accommodation of a religious practice. Holmes has not named any state official as a defendant in order to seek prospective relief, contrast *Bruggeman v. Blagojevich*, 324 F.3d 906, 912-13 (7th Cir. 2003) (discussing the application of *Ex parte Young*, 209 U.S. 123 (1908)), so all variations of the accommodation theory belong in state court.

The decision of the district court in *Endres* is reversed, and that case is remanded with instructions to enter judgment for the State Police on the merits. The decision of the district court in *Holmes* is vacated, and that case is remanded with instructions to dismiss that portion of the complaint that deals with failure to accommodate, while retaining that portion of the complaint that deals with disparate treatment.

A true Copy:

      Teste:

                              _____
                              *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*