Ben ENDRES, Appellant,

v.

INDIANA STATE POLICE, Appellee.

No. 50A05–0210–CV–477.

Court of Appeals of Indiana.

Aug. 27, 2003.

David C. Kolbe, Warsaw, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

DARDEN, Judge.

### STATEMENT OF THE CASE

Ben Endres appeals an adverse judgment by the trial court that upheld the decision of the Indiana State Police Board terminating Endres' employment as an Indiana State Trooper after Endres failed to report to duty as a gaming agent.

We affirm.

### ISSUES

1. Whether, pursuant to Title VII of the Civil Rights Act of 1964, Endres was discriminated against because of his religious belief.

2. Whether Endres' state and federal constitutional rights of free exercise of religion were violated when his employment as an Indiana State Trooper was terminated for failure to report to duty as a gaming agent.

### FACTS [1]

Endres was hired as an Indiana State Trooper in 1991. After Endres was hired, Indiana legalized gambling, including riverboat casinos. Thereafter, the Indiana State Police (the "Department") entered into an interagency agreement with the Indiana Gaming Commission whereby the State Police would provide Troopers as gaming agents at riverboat casinos to provide protection, to ensure public safety, and to enforce gaming laws.

In 1997, the Department developed a lottery system for assigning Troopers to riverboat casinos as gaming agents. As part of the system, a Trooper in the lottery could avoid an assignment to a riverboat casino by requesting a transfer or a promotion for which he/she is qualified before the actual gaming agent assignment is made. Also, a Trooper could solicit a volunteer to serve in his/her stead.

In September 1999, the Bremen Post where Endres was stationed was included in the lottery for the assignment of gaming agents. On October 12, 1999, the Bremen Post lottery was conducted and Endres was chosen first for assignment as a gaming agent. That day, he expressed to his immediate supervisor, Lt. Malayter–Brubaker, that his religious beliefs would foreclose his serving as a gaming agent on a riverboat casino. Lt. Malayter–Brubaker told Endres that, in all likelihood, he would not be assigned as a gaming agent because the Department anticipated that a sufficient number of volunteers would apply for the gaming agent positions.

On October 13, 1999, the day after the Bremen Post lottery was conducted, trans-

---

1. We note that a substantial portion of Endres' Appendix is utterly useless. The Appendix contains excerpts of what appears to be testimony and legal argument without any references identifying the proceedings, the forum, the context, or the speaker. The Table of Contents to the Appendix does not clarify the matters. We were able to complete our review because the State provided the transcripts in its Appendix. Accordingly, we direct counsel to Indiana Appellate Rule 50(A)(1) regarding Appendices in civil cases: "The purpose of an Appendix ... is to present the Court with copies of only those parts of the record on appeal that are necessary for the Court to decide the issues presented."

fer requests for five assignments other than gaming agents were opened and remained open for approximately one month. Endres did not seek a transfer. Also, because Endres had taken and passed the requisite tests, he was qualified to request a promotion to the rank of corporal. Two corporal positions were available at the Bremen Post at the time, and State Police officials with a rank above Trooper did not have to serve as gaming agents. Endres did not apply for either position.

On March 2, 2000, Endres was assigned to the Blue Chip Casino and he was to report for duty on April 3, 2000. He learned of the assignment on March 2, 2000, and he then requested a meeting with Superintendent Carraway. He met with the Superintendent on March 13, 2000. Endres informed the Superintendent that his religious convictions would conflict with his assignment as a gaming agent. The Superintendent asked Endres whether he could work on the dock or other locations near the gaming boat, e.g., hotel lobbies, lounges, or parking lots. Endres responded that he could not become a gaming agent in any form, even a modified version. He then requested a transfer. The Superintendent explained that once an actual assignment is made, there could be no exceptions to that assignment.

On March 23, 2000, the Superintendent sent a letter to Endres stating:

I enjoyed meeting with you and discussing your views on the gaming boats. I truly understand your convictions and believe that you have a very deep faith. Our job as law enforcement officers requires that we serve all the people of the State, not just those with whom we feel comfortable. No matter how offensive a person, situation or location may be to us, we have taken an oath to serve, protect, and uphold the laws of the State of Indiana.

You asked if an exception could be made in your case. The answer remains no. I hope you understand the ramifications of your question and the [un]tenable position in which it places me and the agency. I've received several calls from chaplains on your behalf, and have explained to them as well that there can be no exceptions.

Ben, I have heard a disturbing rumor about you not reporting to the gaming boat assignment as required. If this is true, I must inform you that your action would be insubordinate, and would set into place an internal investigation and possible disciplinary action. I hope that is not your intent. I believe you can meet your obligations to the State and the Indiana State Police and still maintain the integrity of your convictions.

(State's App. 290). Lt. Scott Schuh, the Acting Commander of the Bremen Post, received a copy of the letter on March 29, 2000. Lt. Schuh told Endres to report to the boat for his assignment as ordered. Endres informed Lt. Schuh that he would not follow the order.

On April 3, 2000, Endres failed to report for his assignment as a gaming agent. The Superintendent contacted Lt. Schuh on that day and was informed that Endres failed to report as ordered, but had commenced working at his former duties. The Superintendent directed Lt. Schuh to personally instruct Endres to report to the riverboat for his assignment. Lt. Schuh radioed Endres with the instructions. Endres responded "that he could not do it due to his religious convictions." (State's App. 112). After reiterating to Endres that his stance would result in an internal investigation and the possibility of discipline, Lt. Schuh took the steps required to commence the investigation. Lt. Schuh

allowed Endres to continue working while the internal investigation was completed.

As a result of the internal investigation, Superintendent Carraway terminated Endres' employment with the Department for insubordination. After an appeal hearing, on April 9, 2001, the Indiana State Police Board ("Board") upheld the Superintendent's decision terminating Endres. On May 8, 2001, Endres petitioned for judicial review. On February 11, 2002, the trial court held a hearing wherein the parties presented arguments, and the evidence taken at the Board hearing was submitted. On June 27, 2002, the trial court entered its order detailing the evidence, determining that the Board's decision "is supported by substantial evidence and also supported by the law," and concluding that Endres failed to meet his burden to demonstrate that the Board's decision was invalid. (Appellant's App. 58). The court entered judgment for the State. On July 29, 2002, Endres filed a motion to correct error. On August 12, 2002, the court denied Endres' motion to correct error.

Subsequently, after the briefing period in the present case, the Seventh Circuit Court of Appeals entered its decision in Endres' separate federal action. *See Endres v. Indiana State Police*, 334 F.3d 618 (7th Cir.2003) (consolidated with *Holmes v. Marion County Office of Family and Children*, 334 F.3d 618 (7th Cir.2003)). The Seventh Circuit analyzed Endres' Title VII claim and determined that Endres failed to state a claim upon which relief could be granted.

## DECISION

### Standard of Review

■ Courts have the power to review actions of state agencies taken pursuant to the Administrative Orders and Procedures Act ("AOPA"); however, the power of judicial review is limited. *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind.2000). Courts may set aside only those agency decision that are:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance or procedure required by law; or

(5) unsupported by substantial evidence.

*Id.* (quoting Ind.Code § 4–21.5–5–14(d)). Agency decisions as to findings of fact are accorded deference; however, no such deference is accorded to the agency's conclusions of law. *Id.*

### 1. *Title VII*

As noted in FACTS, the Seventh Circuit Court of Appeals rendered a decision in the federal action commenced by Endres. *See Endres*, 334 F.3d 618. The federal court outlined the appropriate analysis under Title VII, 42 U.S.C. § 2000e(j). *Id.* In general terms, an employer or prospective employer is required to make reasonable accommodations for employees' religious observances and practices, unless such would cause undue hardship for the employer. *Id.* The court observed that the "reasonableness" component is distinct from the "undue hardship" component. *Id.* (citing *Vande Zande v. Wis. Dept. Admin.*, 44 F.3d 538 (7th Cir.1995)). The court then determined that, at its essence, Endres asserted "a claim of entitlement in the future to choose which crimes would be investigated and which potential victims protected." *Endres*, 334 F.3d 618 (analogizing to the "same claim of entitlement" asserted by the plaintiff in *Ryan v. U.S. Department of Justice*, 950 F.2d 458 (7th

Cir.1991)). The court engaged in an extensive analysis of various strongly-held religious beliefs that, if exercised by law enforcement officers during the course of their duties, would thwart the most basic tenets of public protection: the neutral enforcement of laws and protection of potential victims. *Endres,* 334 F.3d 618. The *Endres* court held that an accommodation that would allow a law enforcement officer to choose which laws to enforce and whom to protect would be "unreasonable [for] any police or fire department to tolerate." *Id.* at 624. The court determined that Endres' complaint failed to state a claim upon which relief could be granted. *Id.*

Turning to the present case, it is apparent that Endres presents the same Title VII claim in this case. He bases his state action Title VII claim upon the same concepts discussed and resolved by the Seventh Circuit in *Endres.* Although the State could not have urged res judicata prior to briefing this case, inasmuch as the federal court's decision had not been announced, the State's presentment of additional authority herein allows us to address such.

■ "The doctrine of res judicata consists of two concepts, claim preclusion and issue preclusion." *Wedel v. American Elec. Power Serv. Corp.,* 681 N.E.2d 1122, 1131 (Ind.Ct.App.1997), *trans. denied.* The concept of claim preclusion will apply when a final judgment on the merits has been rendered which then acts as a complete bar to a subsequent action on the same issue or claim between those parties and their privies. *Id.* Under the concept of claim preclusion, "all matters that were or might have been litigated are deemed conclusively decided by the judgment in the prior action." *Id.*

■ Issue preclusion, also referred to as collateral estoppel, acts to bar a subsequent attempt to relitigate the same fact or issue where that fact or issue was necessarily adjudicated in a former suit and is presented in a subsequent action. *Mendenhall v. City of Indianapolis,* 717 N.E.2d 1218, 1225 (Ind.Ct.App.1999), *trans. denied.* "In that situation, the former adjudication will be conclusive in the subsequent action even if the two actions are on different claims." *Id.* However, issue preclusion does not extend to matters which were not expressly adjudicated. *Id.*

■ Issue preclusion is the branch of res judicata applicable here. In *City of Anderson v. Davis,* 743 N.E.2d 359, 365–66 (Ind.Ct.App.2001), *trans. denied,* and *Mendenhall,* 717 N.E.2d at 1225–26, this court determined that the parties were collaterally estopped from raising issues in state court that had been finally determined in previous federal actions. Such is the case here. The complaint in federal court features the same parties, the same action, and the specific Title VII issue asserted by Endres in this case. Thus, the Seventh Circuit's decision on the Title VII issue bars Endres from relitigating that specific issue.

## 2. Federal and State Constitutional Claims

First, the State urges that Endres failed to raise federal and state constitutional religion claims until the filing of his motion to correct errors, thereby waiving those issues. Although Endres' motion to correct error appears to contain the first clear attempt at consideration of the federal and state constitutions, given our precepts of notice pleading, the issues are properly before us.[2]

---

**2.** In his petition for judicial review of the

Board's decision, Endres stated: "the deci-

■ We turn first to the Indiana Constitution. In *City Chapel Evangelical Free, Inc. v. City of South Bend,* 744 N.E.2d 443, 445–46 (Ind.2001), a case regarding the State's power of condemnation of church property, our supreme court outlined the tenets of the Indiana Constitution's pronouncements on religion and distinguished the federal provisions. The court noted three sections of "Article 1, the Bill of Rights, of the Indiana Constitution, which provide as follows:"

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

Section 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent.

*Id.* Endres cites the same three sections in his Brief.

The court in *City Chapel* observed:

When Indiana's present constitution was adopted in 1851, the framers who drafted it and the voters who ratified it did not copy or paraphrase the 1791 language of the federal First Amendment. Instead they adopted seven separate and specific provisions, Sections 2 through 8 of Article 1, relating to religion. Clearly, the religious liberty provisions of the Indiana Constitution were not intended merely to mirror the federal First Amendment. We reject the contention that the Indiana Constitution's guarantees of religious protection should be equated with those of its federal counterpart and that federal jurisprudence therefore governs the interpretation of our state guarantees.

*Id.* (footnotes omitted). As to the protections afforded by Indiana's Bill of Rights and the State's ability to burden those rights, the court stated:

[I]n Indiana the police power is limited by the existence of certain preserves of human endeavor, typically denominated as interests not 'within the realm of the police power,' upon which the State must tread lightly, if at all. Put another way, there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies.

*Id.* at 446 (quoting *Price v. State,* 622 N.E.2d 954, 960 (Ind.1993) (citations omitted)).

While Endres does not specifically so state, his argument must be that the Department's rule requiring him to report for duty as a gaming agent, once he failed to request a transfer or a promotion, or to solicit a volunteer in his stead, materially burdened his right of religious freedom guaranteed by the Indiana Bill of Rights. We reject that notion.

■ Churches, and by implication the religious freedoms enjoyed by worshippers, are subject to reasonable regulations, not tantamount to alienation, by the State

sion of the Indiana State Police ... was contrary to Title VII of the Civil Rights Act of 1964 and its progeny together with a violation of the United States Constitution and Indiana Constitution each guaranteeing religious free-

dom and the free exercise thereof in that the State Police discharged Petitioner, Ben P. Endres, for the lawful exercise of his religious beliefs without making reasonable accommodations...." (Appellant's App. 46).

to the extent as might be required to promote the public health, safety, or general welfare. *See City Chapel,* 744 N.E.2d at 446; *Church of Christ v. Metro. Bd. of Zoning App.,* 175 Ind.App. 346, 351, 371 N.E.2d 1331, 1334 (1978). A core right would be materially burdened "[i]f the right, as impaired, would no longer serve the purpose for which it was designed." *City Chapel,* 744 N.E.2d at 447 (quoting *Price,* 622 N.E.2d at 960 n. 7). "The 'material burden' analysis looks only to the magnitude of the impairment and does not take into account the social utility of the state action at issue." *Id.*[3]

Here, the Department's interagency agreement with the Indiana Gaming Commission requiring Troopers to serve as gaming agents at riverboat casinos promotes the health, safety, and general welfare of the public. The use of Troopers to protect the public and enforce laws relating to gaming was a natural outgrowth of their duties as law enforcement officials. In explaining the neutral and unbiased approach required of law enforcement officials, the federal court in *Endres* stated:

Law-enforcement agencies need the co-operation of all members. Even if it proves possible to swap assignments on one occasion, another may arise when personnel are not available to cover selective objectors, or when ... seniority systems or limits on overtime curtail the options for shuffling personnel. Beyond all of this is the need to hold police officers to their promise to enforce the law without favoritism—as judges take an oath to enforce all laws, without regard to their (or the litigants') social, political, or religious beliefs. Firefighters must extinguish all fires, even those in places of worship that the firefighter regards as heretical. Just so with police.

'The public knows that its protectors have a private agenda; everyone does. But it would like to think that they leave that agenda at home when they are on duty—that Jewish policemen protect neo-Nazi demonstrators, [and] that Roman Catholic policemen protect abortion clinics.... We judges certainly want to think that U.S. Marshals protect us from assaults and threats without regard to whether, for example, we vote for or against the pro-life position in abortion cases.'

*Endres,* (quoting *Rodriguez v. Chicago,* 156 F.3d 771, 779 (7th Cir.1998) (Posner, C.J., concurring)). Thus, the Department's actions served goals that would allow some limitations on the religious free-

---

**3.** The State contends that Title VII "requires more than either the federal or state Constitution, and therefore, a ruling in favor of the Department on the Title VII issue precludes a finding that ... Endres' constitutional rights were violated." Appellee's Br. at 23. The Title VII analysis requiring reasonable accommodations that do not present undue hardships to the employer differs from the "materially burdens" analysis under the Indiana Constitution in that the social utility of the burden is not considered. Put differently, the undue hardship to the employer considered of paramount importance under Title VII, is not a factor of the same significance under the Indiana Constitution analysis.

Having said that, to the extent that our analysis under the Indiana Constitution parallels the Title VII discussion within *Endres* regarding the burdens to the parties, we believe our analysis to be appropriate under the standard outlined in *City Chapel.* Interestingly, within his Brief and without any analysis, Endres admits the nexus between Title VII and constitutional provisions by stating: "Clearly, for the most part, the constitutional jurisdiction has been defined, expanded, and supplanted by Title VII case law development. Title VII, however, is itself rooted in the original constitutional guarantees." Appellant's Br. at 17 n. 1. The foregoing was apparently offered to explain Endres' brief analysis of the constitutional provisions.

doms of those Troopers who find gaming inconsistent with their religious beliefs.

The impairment to Endres' constitutional religious freedoms was not so material or absolute inasmuch as he had alternatives until the final assignment was made on March 2, 2000. Endres acknowledged that he ignored opportunities to apply for promotions or seek transfers that would have resolved his dilemma. The Department's interagency agreement requiring Troopers to serve as gaming agents was well known in advance to Endres. Also, Endres knew that the Bremen Post, where he was stationed, was included in the gaming agent lottery as of September 1999. It is apparent that the mere existence of the interagency agreement did not burden Endres' religious freedoms, inasmuch as he did not formally express his concerns until his name was chosen first in the October 12, 1999 lottery for assignment of gaming agents. Notwithstanding his supervisor's assurance that, in the past, sufficient volunteers had filled the gaming positions at the Blue Chip Casino, Endres knew that he would definitely be assigned first if the gaming positions were not filled by volunteers. Endres specifically chose not to request a transfer or a promotion to corporal, two of the available alternatives, until after his assignment to the Blue Chip Casino occurred on March 2, 2000. Accordingly, no burden to his religious freedoms would have occurred had he pursued an available alternative at the time his name was chosen as the first Trooper in line for assignment to the Blue Chip Casino. Because alternatives that did not burden his religious freedoms had been available to Endres until his official assignment, the assignment of Troopers as gaming agents did not materially burden Endres' religious freedoms under the Indiana Constitution, and his claim under the Indiana Constitution fails.

We turn to Endres' federal constitution claim. Endres does not state the portions of the federal constitution upon which he relies; instead, he offers two federal cases as analogous to his own: *Indiana State Employees Assoc., Inc. v. Negley*, 365 F.Supp. 225 (1973) (employees may not be discharged solely for political affiliation, or reasons motivated by racial or religious factors), and *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (public welfare benefits cannot be denied on the basis of faith). Without significant analysis, Endres suggests that the cases are relevant because his termination was based upon his religious beliefs. The record discloses otherwise. The evidence demonstrates that Endres was terminated for insubordination for failing to report to his assignment once it was officially made on March 2, 2000.

Therefore, the trial court did not err in determining that the Board's decision was supported by substantial evidence, and the trial court's judgment is affirmed.

BAKER, J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I concur but write separately to make an observation concerning the res judicata effect of the decision of the Seventh Circuit Court of Appeals rather than any res judicata effect of the litigation at the Federal District Court level.

The chronology of events as between the Marshall Superior Court and the Federal District Court is germane to our consideration of the issue. Endres filed his Petition for Judicial Review on May 8, 2001. On December 28, 2001, the Federal District Court for the Northern District of Indiana decided that Endres' Civil Rights

claim could proceed in federal court. Thus, Endres was victorious, at least temporarily, at the federal court level. Accordingly, the federal trial court decision could not have a res judicata effect adverse to the interest of Endres.[4] On June 27, 2002, the Marshall Superior Court entered its judgment denying relief to Endres under the Civil Rights Act. It was not until one year later, June 27, 2003, that the Seventh Circuit held that Endres, as a law enforcement officer, had no viable claim under the Civil Rights Act for the termination of his employment.

Be that as it may, the Seventh Circuit decision became final while the present appeal was pending before us. That decision, therefore, has res judicata implications to the decision we must make upon this issue before us. See 50 C.J.S., *Judgments* § 711 (1977) ("a decision of an appellate court will preclude any further action on the same matter between the parties....")[5]

For the reasons stated I concur.

---

**4.** The decision of the Federal District Court was not a decision upon the merits of whether Endres was entitled to recover under his civil rights action but could be argued to be a decision upon the merits of the issue finally decided by the Seventh Circuit, i.e., whether Endres had a viable civil rights claim at all. It was upon this issue that the Seventh Circuit reversed the Federal District Court.

**5.** The termination litigation in the Marshall Superior Court was not *further action* because it occurred prior to the Seventh Circuit decision. However, it may be reasoned that the appeal before us is such *further action* and is subject to the application of the res judicata doctrine.